IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA     )
     )
     v.     )     Criminal No. 09-05
     )
CHRISTINA MARIE KORBE     )

**GOVERNMENT'S OMNIBUS RESPONSE TO
DEFENDANT'S MOTIONS FOR DISCOVERY**

AND NOW comes the United States of America, by its attorneys, Robert S. Cessar, Acting United States Attorney for the Western District of Pennsylvania, and Troy Rivetti, Linda L. Kelly, and Donovan J. Cocas, Assistant United States Attorneys for said district, and hereby submits the following Omnibus Response to Defendant's motions for discovery:

### I.  Introduction and Procedural Overview

On November 19, 2008, Christina Marie Korbe (Korbe) shot and killed FBI Special Agent Samuel Hicks while he was serving an arrest warrant for Korbe's husband.  See Doc. No. 1, ¶ 3.

On December 8, 2008, the United States filed a Criminal Complaint charging Korbe with the murder of Special Agent Hicks. See Doc. No. 1.

On December 15, 2008, a probable cause/detention hearing was held.  See Doc. No. 8 (Minute Entry) and No. 140 (Transcript of Detention Hearing ("Detention Hearing Trans.")).  At that hearing, the government presented evidence of (among other things) Korbe's recent use of cocaine, her acknowledgment to her brother that

"coke" was in her "blood" on November 19, 2008, and that drug use paraphernalia had been found in her bedroom.  See Detention Hearing Trans., pp. 12-15.  The Court was informed that, pursuant to the execution of search warrants, over 500 grams of cocaine (valued at $14,000 to $16,000) had been seized from her home, as well as 3 firearms and several boxes of ammunition.  Id., pp. 14-15.  The government produced recorded statements of Korbe – made while being held in custody for the murder of a federal agent – during which she threatened to kill (or have killed) 3 additional individuals.  Id., pp. 11, 19-22, 23-27; see also Gov. Exh. 1 from Detention Hearing (compact disc of recorded calls), and Gov. Exh. 2 (transcripts of calls).  One of those individuals was Gino Riccelli, a drug-trafficking associate and co-defendant of Korbe's husband.  Christina Korbe suspected that Riccelli had cooperated with law enforcement, and hence was responsible for the presence of law enforcement at her home on the morning of November 19, 2008.[1]

At the conclusion of the December 15, 2008 hearing, United States Magistrate Judge Robert C. Mitchell found probable cause to believe that Korbe had committed the charged crimes and ordered her to be held without bail pending trial.  See Doc. No. 9.

On January 8, 2009, an Indictment was returned by the grand jury charging Korbe with the following crimes (all occurring on November 19, 2008):  Murder of a federal officer, in violation of

---

[1]  See Doc. No. 140, pp. 21-22, and Transcript of portion of recorded call on November 21, 2008, 1:58 p.m. (Gov. Exh. 2 from Detention Hearing), which is attached hereto as Exhibit A.

18 U.S.C. §§ 1111 and 1114 (Count 1); Assault of a federal officer through the use of a dangerous weapon, in violation of 18 U.S.C. §§ 111(a)(1) and (b) (Count 2); Using, carrying and discharging a firearm during and in relation to a crime of violence and possessing said firearm in furtherance thereof, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and (iii) (Count 3); and Aiding and abetting the possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1), 924(e) and 2 (Count 4). See Doc. No. 10.

On March 19, 2009, a Superseding Indictment was returned by the grand jury. See Doc. No. 26. The Superseding Indictment reasserted the aforementioned crimes and contained the following additional charges: Conspiracy to distribute and to possess with the intent to distribute 500 grams or more of cocaine, a Schedule II controlled substance, from 1990 to November 19, 2008, in violation of 21 U.S.C. § 846 (Count 5); Possession with the intent to distribute 50 grams or more of cocaine base, a Schedule II controlled substance, on November 19, 2008, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(iii), and 18 U.S.C. § 2 (Count 6); Possession with the intent to distribute a quantity of cocaine, a Schedule II controlled substance, on November 19, 2008, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), and 18 U.S.C. § 2 (Count 7); Using, carrying and discharging a firearm during and in relation to a drug trafficking crime and possessing said firearm in furtherance thereof, on November 19, 2008, in violation of 18

U.S.C. §§ 924(c)(1)(A)(i) and (iii) (Count 8); and Possession of a firearm by an unlawful user of a controlled substance, on November 19, 2008, in violation of 18 U.S.C. § 922(g)(3) (Count 9).[2]

Korbe has filed the following discovery-related pretrial motions:

* Motion for Disclosure of Impeaching Evidence (Doc. No. 37);

* Motion for Discovery (Doc. No. 38);

* Motion for Early Disclosure of All "Jencks Act" Material (Doc. No. 39);

* Motion for Discovery (Doc. No. 94);

* Motion for Discovery of Statements of Co-Conspirators (Doc. No. 95);

* Specific Brady Request Re: The Separate and Distinct Criminal Activities of Robert Korbe (Doc. No. 97);

* Brady Motion Re: The Investigation and Prosecution of Robert Korbe, His Alleged Co-Conspirators and Others in U.S. v. Terry, et al. (Doc. No. 100);

* Brady Motion Re: Experiments, Tests, Measurements, Etc. (Doc. No. 101);

* Motion for Full Disclosure of Redacted Documents (Doc. No. 102); and

* Motion for Pretrial Production of Statements of Individuals Not to be Called as Witnesses (Doc. No. 107).

This pleading sets forth the government's omnibus response to Korbe's discovery motions.

_____

    [2] The Superseding Indictment also contains criminal forfeiture allegations pursuant to 18 U.S.C. § 924(d), 21 U.S.C. §§ 853(a)(1), 853(a)(2) and 853(p), and 28 U.S.C. § 2461(c).

## II.  <u>Response to Defendant's Discovery Motions</u>

The law is well-settled that "[c]riminal pretrial discovery is, of course, vastly different from discovery in civil cases." <u>United States v. Ramos</u>, 27 F.3d 65, 67-68 (3d Cir. 1994).  "In contrast to the wide-ranging discovery permitted in civil cases, Rule 16 of the Federal Rules of Criminal Procedure delineates the categories of information to which defendants are entitled in pretrial discovery in criminal cases, with some additional material being discoverable in accordance with statutory pronouncements and the due process clause of the Constitution."  <u>Id.</u>; <u>accord</u> <u>United States v. Casseus</u>, 282 F.3d 253, 257 (3d Cir. 2002) (affirming district court's denial of defense request for disclosure and interview of eyewitness/anticipated government trial witness; "[I]t is clear that a criminal defendant does not have the right to full discovery of the government's case.").

As the Supreme Court explained in <u>United States v. Ruiz</u>, 536 U.S. 622, 629 (2002), the Constitution does <u>not</u> require the government to share "all useful information" with the defendant during discovery.  In particular, the government is not required to disclose impeachment material relating to informants or other witnesses, as premature disclosure could "disrupt ongoing investigations," expose prospective witnesses to "serious harm," and would place a substantial "burden" on the government prior to trial preparation.  <u>Id.</u> at 631-32.

5

The United States accepts its obligations under <u>Brady v.
Maryland</u>, 373 U.S. 83 (1963), <u>Giglio v. United States</u>, 405 U.S. 150
(1972), Rules 12 and 16 of the Federal Rules of Criminal Procedure,
and the Jencks Act, 18 U.S.C. § 3500.  Further, the United States
is willing to cooperate with any reasonable request by defendant.

The government notes, however, that its obligation to make
available pretrial discovery materials is governed primarily by
Rule 16 of the Federal Rules of Criminal Procedure.  That rule
requires the government to produce certain categories of
information upon request of the defendant:  1) the defendant's
statements that are in written or recorded form (including grand
jury testimony) and any oral statement given by the defendant to a
person then known by the defendant to be a government agent (Rule
16(a)(1)(A) & (B)); 2) the defendant's prior criminal record (Rule
16(a)(1)(D)); 3) all documents and tangible objects within the
possession, custody or control of the government which are material
to the preparation of the defendant's defense or are intended for
use by the government as evidence in chief at the trial, or were
obtained from or belong to the defendant (Rule 16(a)(1)(E)); 4)
results or reports of physical or mental examinations or other
types of scientific tests in the government's possession which are
material to the preparation of the defense or are intended for use
by the government as evidence in chief at the trial (Rule
16(a)(1)(F)); and 5) a written summary of expert testimony the

government intends to use during its case in chief at trial (Rule 16(a)(1)(G)).

Throughout the pendency of this case, the United States has made ongoing disclosures of evidence and information. Those disclosures have been extensive and are well in excess of any required by Rule 16. <u>See</u> Rule 16 Receipt (Doc. No. 19), and copies of numerous discovery-related correspondence, all of which are attached hereto as Exhibit B.

Under <u>Brady v. Maryland</u>, <u>supra</u>, and its progeny, the government has the obligation to disclose exculpatory evidence -- evidence that is favorable and material to the defense. Strictly speaking, <u>Brady</u> "'is not a discovery rule, but a rule of fairness and minimum prosecutorial obligation.'" <u>United States v. Starusko</u>, 729 F.2d 256, 262 (3d Cir. 1984) (citation omitted).

> Exculpatory evidence includes material that goes to the heart of the defendant's guilt or innocence as well as that which might well alter the jury's judgment of the credibility of a crucial prosecution witness. Evidence impeaching the testimony of a government witness is exculpatory when the credibility of the witness may be determinative of a criminal defendant's guilt or innocence. If the exculpatory evidence "creates a reasonable doubt" as to the defendant's culpability, it will be held to be material.

<u>Id.</u> at 260 (citations omitted). <u>See also</u> <u>United States v. Bagley</u>, 473 U.S. 667, 682 (1985) (Evidence is "material" when it is reasonably probable that, "had the evidence been disclosed to the defense, the result of the proceeding would have been different.").

Brady material must be disclosed "in time for its effective use at trial." United States v. Higgs, 713 F.2d 39, 44 (3d Cir. 1983). Accord United States v. Presser, 844 F.2d 1275, 1283 (6th Cir. 1988).

The United States is unaware of any exculpatory Brady material pertaining to Korbe.

The Jencks Act, 18 U.S.C. § 3500, requires the government to provide the defense with statements of witnesses that the government intends to call at trial. The Jencks Act protects discovery of such witnesses' statements, however, "until said witness has testified on direct examination in the trial of the case." 18 U.S.C. § 3500(a). See also United States v. Ramos, 27 F.3d at 68; United States v. Campagnuolo, 592 F.2d 852, 858 (5th Cir. 1979); United States v. Horsley, 621 F. Supp. 1060, 1067-68 (W.D. Pa. 1985), aff'd, 831 F.2d 286, 288 (3d Cir. 1987); United States v. Fischbach & Moore, Inc., 576 F. Supp. 1384, 1393 (W.D. Pa. 1983). The Third Circuit has held that a defendant's right to a fair trial is "fully protected" if Brady material relating to the credibility of government witnesses is disclosed "the day that the witness testifies." Higgs, 713 F.2d at 44.

The United States acknowledges, however, that a strict adherence to the dictates of the Jencks Act could cause delays at trial. Therefore, the government will voluntarily turn over Jencks Act materials seven (7) days prior to trial to ensure that

unnecessary interruptions or delays are avoided.   The government stresses, however, that this agreement applies only to those Jencks Act materials that it possesses at that time.   If additional Jencks/<u>Brady</u> materials are developed thereafter, they will be made available, to the extent practicable, prior to the witness testifying on direct examination.

Outside of the aforementioned statutes, rules, and case law, defendants have no general constitutional right to pretrial discovery.  <u>Weatherford v. Bursey</u>, 429 U.S. 545, 559 (1977).  Those rights conferred by statute, rule, and case law cannot be used to compel the United States to disclose the minutia of its evidence, its trial strategy, or its investigation.   <u>United States v. Fiorvanti</u>, 412 F.2d 407, 411 (3d Cir. 1969); <u>accord</u> Fed. R. Crim. P. 16(a)(2), **Information Not Subject to Disclosure** ("Except as Rule 16(a)(1) provides otherwise, this rule does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case.  Nor does this rule authorize the discovery or inspection of statements made by prospective government witnesses except as provided in 18 U.S.C. §3500.").

Thus, <u>Brady</u>, Rule 16, and the Jencks Act should be construed as limits on discovery, within which limits the trial court may exercise its discretion.  <u>See United States v. Randolph</u>, 456 F.2d 132, 136 (3d Cir. 1972); <u>Fischbach & Moore, Inc.</u>, 576 F. Supp. at

1393 (Brady is not a discovery device); United States v. Deerfield Specialty Papers, 501 F. Supp. 796, 819 (E.D. Pa. 1980) (pretrial discovery rules are not meant to permit "fishing expeditions" into government case files); cf. United States v. Adams, 759 F.2d 1099, 1111 (3d Cir. 1985) (discovery is within the discretion of the district court); United States v. Liebert, 519 F.2d 542, 548 (3d Cir. 1975) (defendant's discovery demands must be reasonable).

In this case, Korbe has filed several discovery motions containing requests for early disclosure of impeachment material pertaining to the government's anticipated trial witnesses. The government intends to provide the majority of that information -- to the extent that it exists -- at the time that the government discloses the Jencks Act materials (i.e., seven days prior to trial). To the extent that Korbe seeks an earlier disclosure of this "impeachment" information, the government objects.

The Jencks Act, 18 U.S.C. §3500, was enacted to set limits on pretrial discovery of witness statements in criminal cases, and, hence, reflects a legislative determination that a criminal defendant is entitled to use such statements for impeachment purposes in cross-examination, rather than in pretrial preparation. See Palermo v. United States, 360 U.S. 343, 359 (1959); United States v. Murphy, 569 F.2d 771, 773 (3d Cir. 1978). Under the Act itself, the government must produce statements of the government witnesses at the end of their direct examination:

> In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a government witness or prospective government witness (other than the defendant) shall be the subject of subpena [sic] discovery, or inspection until said witness has testified on direct examination in the trial of the case.

18 U.S.C. §3500.

The United States Supreme Court and the Court of Appeals for the Third Circuit both have confirmed that Jencks Act material need not be produced until after the witness testifies at trial. Palermo, 360 U.S. at 349; United States v. Starusko, 729 F.2d at 263; Murphy, 569 F.2d at 773; United States v. Kenny, 462 F.2d 1205, 1212 (3d Cir. 1972). Moreover, the Third Circuit repeatedly has held that a district court cannot compel the government to disclose statements of its witnesses before the conclusion of their direct examination, and that ordering early disclosure of such information constitutes an abuse of discretion or even reversible error. United States v. Higgs, 713 F.2d at 44-45; Murphy, 569 F.2d at 773; Kenny, 462 F.2d at 1212; United States v. Scolnick, 392 F.2d 320, 327 (3d Cir. 1968). See also In re United States, 834 F.2d 283 (2d Cir. 1987); United States v. Algie, 667 F.2d 569, 571 (6th Cir. 1982); United States v. Litman, 547 F. Supp. 645, 652 (W.D. Pa. 1982).

Despite the plain language of the statute and judicial authorities, Korbe requests early disclosure of "impeachment" material pertaining to the government's witnesses, relying on Brady

11

and the pretext that the granting of the motion accords with judicial efficiency and economy and preserves defendant's due process rights.

In reality, Korbe is seeking to have the United States identify its witnesses and provide a witness list in advance of trial. It is well established, however, that "the [criminal] discovery rules do not permit the defense to get the names of witnesses." United States v. Mitchell, 540 F.2d 1163, 1166 (3d Cir. 1977); accord United States v. Casseus, 282 F.3d at 254, 257 (affirming district court's refusal to order pretrial discovery of the government's witness list; "a criminal defendant does not have the right to full discovery of the government's case"); United States v. Addonizio, 451 F.2d 49, 62 (3d Cir. 1972) ("in no event is the government required to divulge the identity of its witnesses in a noncapital case"). See also United States v. DiPasquale, 740 F.2d 1282, 1294 (3d Cir. 1984); Government of the Virgin Islands v. Ventura, 476 F.2d 780, 781 n.1 (3d Cir. 1973).

It is equally well-settled that disclosure of evidence that may be used to discredit government witnesses is not directly exculpatory as to a defendant's substantive guilt, and need not be disclosed in advance of trial. As noted above, the Third Circuit held in United States v. Higgs that disclosure of witness credibility evidence at the time of trial sufficiently ensures a defendant's right to a fair trial:

> No denial of due process occurs if Brady material
> is disclosed to [the defendant] in time for its
> effective use at trial.... The Brady material in
> this case was information that [the defendant]
> could use on cross-examination to challenge the
> credibility of government witnesses. For that type
> of material, we think [the defendant's] right to a
> fair trial will be fully protected if disclosure is
> made the day that the witness testifies.
> Disclosure at that time will fully allow [the
> defendant] to effectively use that information to
> challenge the veracity of the government's
> witnesses.

713 F.2d at 44.

In Higgs, the court specifically rejected the argument "that the requested information might also be used by defense counsel for investigating their case." Id. at 43 n.5. The Higgs defendants claimed "that knowledge of who the government's witnesses were and how they fit into the alleged conspiracy might lead to other evidence pertinent to the issue of substantive guilt or innocence." Id. In addition, the Higgs defendants asserted "that the information must be provided before trial to allow them sufficient time to prepare their case." Id.

The Third Circuit disagreed, holding that "the requested information" was not "Brady material for that purpose."

> While that information is material for impeachment
> purposes, names and addresses of witnesses and what
> they have been promised by the government for their
> cooperation absent other evidence, sheds little if
> any light on the underlying question of substantive
> guilt. Thus that information would not be material
> under the appropriate [United States v.] Agurs test
> [427 U.S. 97 (1976)], and would not need to be
> disclosed by the government under Brady

Id. (emphasis added).

13

The United States is particularly concerned with early disclosure in this case, where Korbe – after she was arrested and held in custody for the murder of a federal agent – threatened to kill an individual who she believed had cooperated with law enforcement against her husband.  In addition, she (and her family) attempted to obstruct justice by trying to coerce another individual to claim responsibility for a firearm that had been seized at one of the Korbe businesses; Korbe threatened to have that individual killed if he did not comply with their demand.[3]

Accordingly, pursuant to the foregoing legal authority, the government will provide impeachment material relating to its trial witnesses at the time that it discloses the Jencks Act materials for the witnesses.

In this case, Korbe also seeks pretrial disclosure of a wealth of information that goes well beyond the types of discovery permitted in federal criminal cases.  The United States hereby responds to each of the defendant's discovery motions:

A.  **Motion for Discovery (Doc. No. 38)**

The United States responds to the specific requests in this motion as follows:

---

[3]  See Doc. No. 140, pp. 23-29, and Transcripts of portions of recorded calls on November 29, 2008, 8:32 a.m., and November 30, 2008, at 2:09 p.m. (Gov. Exh. 2 from Detention Hearing), which are attached hereto as Exhibit C.

1.   All material and information that may be favorable to the Defendant on the issues of guilt and punishment within the scope of Brady.   As explained above, the United States is unaware of any Brady material pertaining to Korbe.

2.   Written summaries of opinion testimony.   The government has not yet determined which expert testimony it will use in its case in chief.   The Advisory Committee Notes for Fed. Crim. R. 16(a)(1)(E) (1993 Amendment)[4] clarifies that the Rule is "intended to minimize surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merits of the expert's testimony through focused cross-examination."   Accordingly, the United States agrees that, at least two (2) months prior to trial, in compliance with the requirements of Fed. R. Crim. P. 16(a)(1)(G), it will provide the defendant with a written summary of any expert testimony that may be introduced in the government's case in chief, as well as a curriculum vitae of the expert.   See also Response by United States to Korbe's Motion for Disclosure of Expert Witnesses, Opinions, Bases and Reasons of Opinions and Qualifications (Doc. No. 99), which is being filed contemporaneously herewith.

---

[4]   Fed. Crim. R. 16(a)(1)(E) was the predecessor for what is now set forth at Fed. Crim. R. 16(a)(1)(G).   See Fed. Crim. R. 16 (2002 Amendments).

3.    Copies  of  any  results  and  reports  of  tests  and experiments.  In fulfillment of its obligations under Fed. R. Crim. P. 16 and Local Criminal Rule 16, the United States already has provided defendant with copies of reports of relevant scientific tests and examinations.

4. Government Sentencing Guidelines calculations.  The United States objects to this request as beyond the scope of pretrial discovery.  In the event that Korbe decides to plead guilty, the undersigned counsel for the United States is amenable to discussing the  government's  position  concerning  sentencing  guideline applications, in order that defense counsel may better advise their client.

### B.    Motion for Early Disclosure of All "Jencks Act" Material (Doc. No. 39)

Defendant requests that this Court violate the Jencks Act and order early disclosure of those materials "at least sixty (60) days prior to trial."  The United States objects.  As explained above, the government has agreed to voluntarily turn over Jencks Act materials seven days prior to trial to ensure that unnecessary interruptions or delays are avoided.

### C.    Motion for Disclosure of Impeaching Evidence (Doc. No. 37)

Defendant requests that this Court direct the government "to forthwith disclose" various categories of "impeachment material." For the reasons explained above, the United States objects to the

"forthwith" production of Jencks Act materials.  The United States intends to voluntarily turn over Jencks Act materials seven days prior to trial.  The United States further responds to each request as follows:

1.   Criminal history of prosecution witnesses.   This information, to the extent that it exists, will be provided with the Jencks Act materials for each trial witness.

2.  Records and information revealing prior misconduct or bad acts attributed to prosecution witnesses.   To the extent that defendant is requesting disclosure of evidence that may be used to discredit the government's witnesses, such information, to the extent that it exists and is known to the government, will be provided with the Jencks Act materials for each trial witness.

3.  Consideration or promises of consideration given to or for the benefit of prosecution witnesses.   This information, to the extent that it exists, will be provided with the Jencks Act materials for each trial witness.

4.   Criminal prosecutions, investigations, or potential prosecutions of government witnesses.   This information, to the extent that it exists and is known to the government, will be provided with the Jencks Act materials for each trial witness.   In particular, the United States agrees to provide the defendant with

17

all known information that bears on a witness's bias or motivation to testify and/or assist the government.

5.  The existence and identification of each occasion on which the witnesses testified before any court, grand jury or other tribunal or body in relation to the Defendant or otherwise bearing upon the facts of this case.  This information, to the extent that it exists and is known to the government, will be provided with the Jencks Act materials for each trial witness.

6.  Existence and identification for each occasion on which each witness who is an informer, accomplice, co-conspirator or expert has testified before any court, grand jury or other tribunal or body.  The United States objects to this request as beyond the scope of discovery.  To the extent that this request seeks production of information and/or evidence that could be used to discredit the government's witnesses and/or reveal bias, that information, to the extent that it exists and is known to the government, will be provided with the Jencks Act materials for each trial witness.

7.  All personnel files for the witnesses and the existence and identity of all prosecutory files for the witnesses.  The United States objects to this request as beyond the scope of discovery.

In <u>Pennsylvania v. Ritchie</u>, 480 U.S. 39 (1987), the United States Supreme Court addressed a defendant's contention that "by denying him access" to potentially helpful information in confidential government files – information that he deemed "necessary to prepare his defense" – the "trial court interfered with his right of cross-examination." 480 U.S. at 51. According to the defendant, the "failure to disclose information that might have made cross-examination more effective [i.e., "inconsistent" statements and/or information that might reveal that the witness "acted with an improper motive"] undermines the Confrontation Clause's purpose of increasing the accuracy of the truth-finding process at trial." <u>Id.</u>, 480 U.S. at 52.

The Supreme Court disagreed and flatly rejected the notion that "the Confrontation Clause" should be transformed "into a constitutionally compelled rule of pretrial discovery."

> Nothing in the case law supports such a view. The opinions of this Court show that the right to confrontation is a *trial* right, designed to prevent improper restrictions on the types of questions that defense counsel may ask during cross-examination. The ability to question adverse witnesses, however, does not include the power to require the pretrial disclosure of any and all information that might be useful in contradicting unfavorable testimony. Normally the right to confront one's accusers is satisfied if defense counsel receives wide latitude at trial to question witnesses. In short, the Confrontation Clause only guarantees "an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."

480 U.S. at 52-53 (citations omitted).

The Ritchie Court also definitively held that a defendant is not entitled to free access to the government's confidential files:

> A defendant's right to discover exculpatory evidence does not include the unsupervised authority to search the Commonwealth's files. Although the eye of an advocate may be helpful to a defendant in ferreting out information, this Court has never held – even in the absence of a statute restricting disclosure – that a defendant alone may make the determination as to the materiality of the information. **Settled practice is to the contrary. In the typical case where a defendant makes only a general request for exculpatory material under Brady v. Maryland, it is the State that decides which information must be disclosed. Unless defense counsel becomes aware that other exculpatory evidence was withheld and brings it to the court's attention, the prosecutor's decision on disclosure is final.** Defense counsel has no constitutional right to conduct his own search of the State's files to argue relevance.

480 U.S. at 59 (emphasis added; citations and footnote omitted); accord United States v. Bagley, 473 U.S. 667, 675 (1985) ("[T]he prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial." (citation and footnote omitted)); United States v. Agurs, 427 U.S. 97, 109-10, 111 (1976) ("[T]here is 'no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case.' The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense."; "[W]e have rejected the suggestion that the prosecutor

has a constitutional duty routinely to deliver his entire file to defense counsel." (citations omitted)); Weatherford v. Bursey, 429 U.S. 545, 559 (1977) ("There is no general constitutional right to discovery in a criminal case, and Brady did not create one; as the Court wrote recently, 'the Due Process Clause has little to say regarding the amount of discovery which the parties must be afforded ...'" (citation omitted)).

In Riley v. Taylor, 277 F.3d 261, 301 (3d Cir. 2001), the Court of Appeals for the Third Circuit clarified that a defendant is not even entitled to an "*in camera* inspection" by the Court of the sensitive government materials (for possible subsequent disclosure to the defendant) in the absence of a "'plausible showing' that the inspection will reveal material evidence."  277 F.3d at 301 (quoting Pennsylvania v. Ritchie, 480 U.S. at 58 n.15).  "Mere speculation is not enough."  Riley v. Taylor, 277 F.3d at 301 (citing United States v. Navarro, 737 F.2d 625, 631 (7th Cir. 1984)).[5]  Accord United States v. Brooks, 966 F.2d 1500,

---

[5]  The defendant in Navarro contended that the INS file of a government witness might contain Brady material and that the failure of the government to disclose that file to him had unfairly restricted his ability to cross-examine the witness as to his motives and biases.  The district court had not conducted an *in camera* review of the file, and the Seventh Circuit concluded that one was not necessary:

> Mere speculation that a government file may contain Brady material is not sufficient to require a remand for *in camera* inspection, much less reversal for a new trial.  A due process standard which is satisfied by mere speculation would convert Brady into a discovery device and impose an undue burden upon the district court. ... [D]efendants' assertion that the [witness's]

1504-05 (D.C. Cir. 1992) (collecting cases and explaining that the "usual" case involves "prosecutorial rather than judicial examination" of sensitive government files, in the absence of identification by the defendant of "exculpatory evidence [that the prosecution has] withheld").

Pursuant to the foregoing legal authority, the United States agrees that, for each trial witness, the United States will (to the extent that such files exist) review any witness's personnel file and/or prosecutory file and/or informant file. To the extent that any of those files contain any <u>Brady</u> impeachment-type material, that information will be provided with the Jencks Act materials for each trial witness.

8. The same records and information requested in Items 1 through 7 above with respect to each non-witness declarant whose statements are to be offered into evidence. Subject to the objections set forth above, the United States agrees that, with respect to each non-witness declarant whose statements will be offered into evidence at trial, any <u>Brady</u> impeachment-type material pertaining to said non-witness declarant will be provided

---

INS file contains evidence of a cooperation agreement is nothing more than a shot in the dark. Defendants offered nothing to rebut the government's explicit representation to the district court that no such cooperation agreement existed. ... Accordingly, the district court's refusal to inspect or compel production of the INS file did not violate due process.

737 F.2d at 631-32.

at the time that the United States voluntarily turns over the Jencks Act materials in this case (i.e., 7 days prior to trial).

9. All other records and information which could arguably be helpful or useful to the defense in impeaching or otherwise detracting from the probative force of the prosecution's evidence or which could arguably lead to such records or information. The United States objects to this request as confusing and seemingly beyond the scope of pretrial discovery. The United States further responds that, as explained above, the government accepts and will comply with its obligations under <u>Brady</u>, <u>Giglio</u>, Rules 12 and 16 of the Federal Rules of Criminal Procedure, and the Jencks Act.

### D. <u>Motion for Discovery (Doc. No. 94)</u>

In this motion, Korbe concedes that the United States has spent "a number of days" with defense counsel in an effort to provide them with an opportunity to carefully review the physical evidence in this case. <u>See</u> Doc. No. 94, p. 1. In addition, Korbe concedes that the government has provided copies of any "documents and photographs" requested. <u>Id.</u>[6]

---

[6] In fact, upon completion of the review of the physical evidence, defense counsel requested (by letter dated December 18, 2009) two copies of 38 items. Counsel requested production by December 31, 2009. <u>See</u> December 18, 2009 letter (a copy of which is attached hereto as part of Exhibit B). The United States complied with that request and delivered 2 copies of the requested items on December 29, 2009. <u>See</u> December 29, 2009 letter (a copy of which is attached hereto as part of Exhibit B).

Korbe contends, however, that this motion has been filed "in an abundance of caution for the reason that this is a very serious and emotionally-charged case."  <u>See</u> Doc. No. 94, p. 1.  Korbe asserts that "the fact that a brother officer has been killed" gives rise to a concern that "certain law enforcement officials and others may frankly not see any problem with 'putting a thumb' on the scales of justice so that in their view those responsible (the defendant) can be punished to the fullest." <u>Id.</u>, p. 7. <u>See also</u> <u>Id.</u>, p. 8 ("It is reasonable to expect human nature to channel the loyalty and grief experienced by the loss into reluctance toward disclosure of evidence favorable to the accused.").  Korbe therefore believes that this case "necessitates the request for disclosure beyond that which is constitutionally required." <u>Id.</u>

Korbe requests an order that "all the law enforcement agencies charged with the investigation of these matters and any other law enforcement agency known to have been or was likely to have been a participant in the investigation and arrest of Robert Korbe and Christina Korbe be contacted regarding any information they or their individual agents may have in their file or in their personal memory." <u>Id.</u>, p. 2.

Korbe's motion speaks in generalities about the "nature of this case," and the importance of governmental disclosure of exculpatory and impeaching evidence. **The motion utterly fails, however, to cite to any specific example, or even any indication,**

**that the government has withheld exculpatory material in the instant case.**  Instead, Korbe asserts – without providing any details or explanation – that her "own investigation has revealed witness interviews with law enforcement favorable to Mrs. Korbe." Id., p. 10.  Korbe therefore states: "With this specific Brady request we expect to receive exculpatory information."  Id.

By way of response, the United States again asserts that it is unaware of any Brady material pertaining to Korbe.  The United States requests that counsel for Korbe inform the Court and the government of the specifics of the purported Brady material that they have obtained during their "interviews with law enforcement," so that the government can thereafter respond in a more thorough manner to this assertion and to the attendant Brady request. Moreover, to the extent that Korbe seeks a court order requiring "beyond Brady" disclosures, the United States objects.[7]

With respect to Korbe's request that the government seek out information favorable to her, the United States notes that the government is obligated to provide Brady information that is "actually or constructively in its possession or accessible to it." United States v. Perdomo, 929 F.2d 967, 970 (3d Cir. 1991). The prosecution has a duty to learn of any favorable evidence that is known to others acting on the government's behalf in the case,

---

[7] Korbe's reliance in this regard on Department of Justice guidelines is completely misplaced and directly contrary to settled Third Circuit precedent.  See United States v. Wilson, 413 F.3d 382, 389 (3d Cir. 2005) ("Department of Justice guidelines and policies do not create enforceable rights for criminal defendants.") (collecting cases).

including law enforcement personnel, since a <u>Brady</u> violation may occur where the government fails to turn over evidence that is known only to police investigators and not to the prosecutor. <u>Kyles v. Whitley</u>, 514 U.S. 419, 438 (1995); <u>Youngblood v. West Virginia</u>, 126 S.Ct. 2188 (2006). The government may be deemed to have "constructive possession" of information known by state authorities if the latter are acting on the government's "behalf" or under its "control"; are participating in a "joint investigation" or are part of a "team"; or the government had "ready access" to the evidence. <u>United States v. Risha</u>, 445 F.3d 298 (3d Cir. 2006).

However, <u>Brady</u> does not require the prosecution to search unrelated files to exclude the possibility, however remote, that they contain exculpatory information; see <u>United States v. Joseph</u>, 996 F.2d 36 (3d Cir. 1993); nor are prosecutors required to engage in "open-ended fishing expedition[s]" at the defendant's request. <u>United States v. Merlino</u>, 349 F.3d 144 (3d Cir. 2003). The government is not required to ferret out potentially favorable information from materials that have been disclosed to the defense. <u>United States v. Pelullo</u>, 399 F.3d 197 (3d Cir. 2005). And the prosecutors' obligation to disclose information not personally known to them is limited:

> <u>Kyles</u> cannot be read as imposing a duty on the prosecutor's office to learn of information possessed by other government agencies that have no involvement in the investigation or prosecution at issue.
>            *       *       *

> [T]he prosecution is only obligated to disclose information known to others acting on the government's behalf in a particular case....

Pelullo, 399 F.3d at 216, 218 (citations omitted).

The United States will comply with the foregoing legal requirements.  In addition, the United States hereby responds to the specific requests in the motion as follows:

A.  All discovery previously requested in Defendant's Motion for Discovery (Doc. No. 38).  See Response to Doc. No. 38 above.

B.  All "Brady/Giglio" Information as it Relates to All Counts of the Superseding Indictment.  The United States accepts and will comply with its obligations under Brady, Giglio, Rules 12 and 16 of the Federal Rules of Criminal Procedure, and the Jencks Act.  To the extent that defendant seeks to expand the discovery and disclosure obligations of the United States beyond those authorized by law, the United States objects.

C.  All exculpatory and impeachment information regardless of materiality, and regardless of whether the information itself would be admissible at trial.  The United States accepts and will comply with its obligations under Brady, Giglio, Rules 12 and 16 of the Federal Rules of Criminal Procedure, and the Jencks Act.  To the extent that defendant seeks to expand the discovery and disclosure obligations of the United States beyond those authorized by law, the United States objects.

Moreover, the United States specifically objects to the broad request for disclosure of "information by way of protocols, guidance, or responses to any inquiries to the ATF or other agencies regarding the legality under 18 USC § 922(g) or any other provision of the Gun Control Act, of possession of a firearm by a non-felon who resides in the same household as a convicted felon (e.g., spouse)." This request seeks to impose a disclosure obligation on the United States with respect to an issue that is not exculpatory and/or favorable to Korbe.

In particular, the United States is aware (as is defense counsel) that, over time, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") has issued advisory letters in response to inquiries from private citizens. Those letters explain that a non-felon may legally possess a firearm in a household with a felon – **but only so long as the non-felon keeps the firearm stored or located where the felon cannot exercise dominion or control over it**. The United States is unaware of any advisory letters from the ATF stating that a non-felon can possess or store a firearm without regard to whether the felon is able to exercise dominion or control over the firearm.

The government's contention (and the anticipated trial evidence) is that Korbe kept the Taurus in the marital bedroom that she shared with her felon-husband Robert, that Robert knew she kept the gun there, and that Korbe stored or carried the gun in such a

fashion that Robert could exercise dominion or control over it. The ATF advisory letters, therefore, are not exculpatory and/or favorable to Korbe, and the United States is not required to obtain and/or produce them.

Similarly, the United States specifically objects to the broad request for disclosure of "information by way of protocols, guidance, standard operating procedures, standing orders, training manuals, or lesson plans in general regarding the accepted and proper way to serve/execute arrest or search warrants and the specific operations plan for use for the law enforcement officers who on November 19, 2008 made or attempted to make a 'dynamic entry' into the Korbe residence."

As part of her defense, Korbe apparently intends to attempt to put law enforcement on trial or, at the very least, make some use of the purported "militarization of the police" and the "SWAT-type tactics" which Korbe believes often are used "to serve narcotics warrants."  See Id., p. 7.[8]  In addition, she implies throughout

_____

[8]  In this (and numerous other pretrial motions) Korbe makes reference to "nonviolent" drug offenders.  These references are odd, in that drug-trafficking is illegal, and it often involves firearms and violence.  It is particularly odd for Korbe to place emphasis on "nonviolence," as her husband Robert is an extremely violent offender.  On May 16, 2008, he was arrested by Sharpsburg Police following a traffic stop.  After Robert was ordered from the vehicle, he began to fight with the officers.  The officers tasered Robert, but they were unable to subdue him.  He was tasered again, but he managed to break free from the taser prongs.  After an officer grabbed him, Robert was able to "swing free," and, in the process, he dislocated the officer's right arm.  Eventually, after an extended struggle, several officers were able to tackle and subdue him.  While rolling on the ground, a clear plastic baggie containing cocaine fell from Robert, near his left leg.  Officers eventually placed handcuffs on him.

her numerous pretrial motions that law enforcement could have, or should have, effectuated the arrest of Robert Korbe in a different manner.  The United States submits that this is an improper attempt to insert a collateral (and irrelevant) issue into the trial.

The United States is unaware of any <u>Brady</u> material pertaining to the manner in which the arrest warrant for Robert Korbe was executed on November 19, 2008.  There is no evidence that any "SWAT-type tactics" were employed.  Further, the use (or non-use) of "SWAT-type" tactics has no bearing on any fact for the jury to resolve in this case.

Korbe shot and killed FBI Special Agent Samuel Hicks while he was entering her home in order to effectuate a federal arrest warrant for her husband, Robert.  The law is well-settled that if

---

The following evidence was seized: a small clear plastic bag in his left front pants pocket which contained a small amount of cocaine; a black zippered pouch in his left sock which contained 1 large tied-off clear plastic bag of cocaine, 2 medium tied-off clear plastic bags of cocaine, 1 small clear tied-off bag of cocaine, 2 Vicodin pills, 9 Viagra pills, 3 Cialis pills, $956 in cash, and an "owe" sheet.  The total amount of cocaine seized was 129.20 grams (which is worth thousands of dollars).

Officers attempted to place Robert inside a patrol vehicle. **Robert again broke free, ran down the street, and had to be tasered a third time.**  He was finally subdued and, due to his belligerent and extremely violent behavior, he was taken directly to the Allegheny County Jail (rather than for processing as is customary).  Robert was charged in state court with Aggravated Assault against a police officer, Recklessly Endangering Another Person, Simple Assault, Resisting Arrest, Disorderly Conduct, Possession with Intent to Distribute cocaine, Simple Possession of cocaine, and Criminal Mischief.  <u>See</u> Docket Sheet for Docket No. CP-02-CR-0012403-2008, Court of Common Pleas of Allegheny County.  Robert was on pretrial release in connection with these charges when he was intercepted on a federal wiretap.

officials possess an arrest warrant founded on probable cause, they may enter a house in which the suspect lives when there also is reason to believe the suspect is within.  See Payton v. New York, 445 U.S. 573 (1980); Steagald v. United States, 451 U.S. 204, 212 (1981).

Accordingly, the United States, at trial, will request the Court to instruct the jury as a matter of law that Special Agent Hicks (as well as the detectives and officers with him) acted lawfully in breaching the front door of the Korbe residence in order to attempt to arrest Robert Korbe.

Count 1 of the Superseding Indictment charges that Korbe, "with malice aforethought, did kill Samuel Hicks, Special Agent of the Federal Bureau of Investigation, while he was engaged in his official duties."  Malice aforethought is defined as "either to kill another person deliberately and intentionally or to act with callous and wanton disregard for human life."  See Section 45.16 of Federal Jury Practice and Instructions; see also Model Crim. Jury Instr. 8th Cir. 6.18.1114B (2007); United States v. Tyler, 207 F. App'x 173, 176 (3d Cir. 2006) (unpublished).

Count 2 charges that Korbe "knowingly and by means and use of a deadly or dangerous weapon, ... did forcibly assault, resist, oppose, impede, intimidate, and interfere with Samuel Hicks, Special Agent of the Federal Bureau of Investigation, while he was engaged in his official duties."

The compliance (or non-compliance) by law enforcement with any arrest or search warrant protocol and/or the specific operations plan in place on November 19, 2008 is irrelevant with respect to the issues that the jury must resolve in this case (i.e., the knowledge and intent of Korbe).  Defense counsel has failed to proffer any legal authority indicating otherwise.

The reason for this is simple – **any purported non-compliance by law enforcement with accepted law enforcement protocol(s) would not be a defense to the charges (or, stated differently, Korbe is not permitted to kill a Special Agent of the FBI simply because the arrest could have been effectuated in another manner).** Accordingly, the United States objects to this request.[9]


D.1.   Other  Discovery – all  statements  of  the  accused, including rough notes of law enforcement officers.  In fulfillment

---

[9]   Cf. United States v. Guzman-Padilla, 573 F.3d 865, 890 (9th Cir. 2009) (Defendant, in suppression hearing, argued that Border Patrol's use of controlled tire deflation device converted the stop to an unlawful arrest and demanded production of Border Patrol Policy and Guidelines on use of such devices – which the district court denied: "[E]ven if [agent's] actions were inconsistent with Border Patrol policy, the policy would not have been material to the district court's determination.  While Guzman asserted vaguely that the Border Patrol's failure to follow its own regulations would 'say[] something about what happened here,' this theory of materiality is foreclosed by our case law.  It is well-settled that the scope of the Fourth Amendment's protections is not to be measured by reference to agency guidelines and other extra-constitutional matter. ... Specially, the government's violation of its own rules does not provide a basis for the suppression of evidence in a criminal action.  Guzman thus had no entitlement to the Border Patrol policy under Brady.") (citations omitted).

of its obligations under Fed. R. Crim. P. 16 and Local Criminal Rule 16, the United States already has provided defendant with copies of all of her statements which fall within the purview of Fed. R. Crim. P. 16(a)(1)(A) & (B).

The government is aware of its obligations under United States v. Ammar, 714 F.2d. 238 (3d Cir. 1983), United States v. Vella, 562 F.2d 275 (3d Cir. 1977), and United States v. Ramos, 27 F.3d 65 (3d Cir. 1994). These cases require the government's agents to preserve rough notes created during an investigation. Thereafter, upon motion of the defense, the government must then provide the notes to the district court for a determination that they should be produced on the basis that they contain Brady or Jencks Act material. Ammar, 714 F.2d at 259.

While the government does not oppose the granting of a motion requiring the preservation of these notes as is typically requested, the government does oppose any order requiring the present disclosure of the notes to defendant as that is adverse to the law of this Circuit under Ammar and its progeny.

The government has requested the federal and state (local and county) agents involved in this case to retain copies of any notes they have taken. The government will obtain copies of any such notes for review and production to the Court, if necessary.

The government notes that some state (local and county) agents were involved in this investigation prior to the filing of federal charges. The United States had no control over the retention of

notes by local and county investigators during their investigation. Many local, state and county investigators do not retain their notes. The local investigators have been asked, however, to retain any notes they still have from their investigation, and they have been advised that they must keep any notes they take (or have taken) as part of the federal prosecution.

D.2. Other discovery – identity of all law enforcement officers and others at the scene at 111 Woods Run Road before, during and after the dynamic entry of the Korbe home on November 19, 2008. The United States objects to this request as beyond the scope of discovery. By way of further response, the United States has attempted to identify and interview all law enforcement and other personnel who entered the Korbe home and/or came into contact with defendant Korbe on November 19, 2008. Those interviews have not revealed any <u>Brady</u> material pertaining to Korbe.

E. Timing of Disclosure/Certificate of Compliance. The United States already has set forth its understanding and stated position with respect to the timing of its disclosure obligations. The United States objects to the entry of any order requiring it to disclose "beyond <u>Brady</u>" information. Further, the undersigned Assistant United States Attorneys are well aware of the serious nature of this case and the government's disclosure obligations. As Justice Sutherland wrote over 70 years ago:

> The United States Attorney is the representative
> not of an ordinary party to a controversy, but of a
> sovereignty whose obligation to govern impartially
> is as compelling as its obligation to govern at
> all; and whose interest, therefore, in a criminal
> prosecution is not that it shall win a case, but
> that justice shall be done.  As such, he is in a
> peculiar and very definite sense the servant of the
> law, the twofold aim of which is that guilt shall
> not escape or innocence suffer.  He may prosecute
> with earnestness and vigor – indeed, he should do
> so.  But while he may strike hard blows, he is not
> at liberty to strike foul ones.  It is as much his
> duty to refrain from improper methods calculated to
> produce a wrongful conviction as it is to use every
> legitimate means to bring about a just one.

Berger v. United States, 295 U.S. 78, 88 (1935).  The United

States will use "every legitimate means to bring about a just"

result in this case.  There is no need to request or require the

prosecution to sign a Certificate of Compliance.


   E.   **Brady** **Motion Re: the Investigation and
        Prosecution of Robert Korbe, His Alleged Co-
        Conspirators and Others in U.S. v. Terry, et
        al. (Doc. No. 100)**

   In this motion (Doc. No. 100), Korbe correctly states that

she "was not in any way a suspect or person of interest in the

conspiracy or drug trafficking allegations" giving rise to the

Superseding Indictment in United States v. Anthony Terry, et al.,

Criminal No. 08-365, wherein her husband Robert is charged.  Korbe

describes the charges in that case as a "routine drug

indictment."[10]  Korbe references a "lack of information indicating

---

[10]   It is not.  The indictment stems from a lengthy, multi-
agency wiretap investigation, resulting in charges against 35
people.

violent behavior on behalf of the defendants."[11]  And she asserts

that the "sole reason law enforcement agents breached the front

door of the Korbe home was to execute an arrest warrant on Robert

Korbe in the Terry matter."[12]

Korbe "believes that statements exist of not only Robert

Korbe but also of other defendants in the Terry matter that would

tend to exculpate Christina Korbe."  See Doc. No. 100, p. 2.   In

particular, she references possible statements by Robert Korbe

and/or his co-defendants "which are devoid of any indication that

Christina was a drug trafficker or drug conspirator in any way."

Id.  Korbe believes that statements by individuals that "would

indicate a knowledge of the activities of Robert Korbe at certain

dates and times while at the same time failing to mention

Christina Korbe being involved in criminal activity are subject to

disclosure under Brady and its progeny."  Id., pp. 2-3.  Korbe

also believes that her husband (Robert) has made statements – both

at the time of his arrest, as well as thereafter – which "would be

favorable to her," and which the government must produce pursuant

to Brady.  Id.  Based on these assumptions, Korbe then basically

---

[11]  This statement likewise is incorrect.  See, e.g.,
Criminal No. 08-65, Doc. No. 381 (Transcript of Detention Hearing
for Victor Nelson), pp. 11-14.

[12]  This statement is partially correct.  The sole reason
that law enforcement officers came to the Korbe residence on
November 19, 2008 was to arrest Robert Korbe.  They "breached the
front door" because Robert Korbe refused to open it (and instead
ran to the basement in an attempt to dispose of some cocaine);
the agents, therefore, were required to enter the house in order
to attempt to arrest him.

requests the government to provide her with every investigative report and every piece of evidence pertaining to the Terry wiretap investigation and prosecution. See Doc. No. 100, pp. 3-6 (Requests 1 - 8).

This motion (Doc. No. 100) appears to be based on a misunderstanding of drug-trafficking conspiracies, federal drug conspiracy law, Brady, and the law governing pretrial disclosures in federal criminal prosecutions. Every request in the motion is overly broad and beyond the scope of pretrial discovery. For these reasons, the United States objects to this motion.

As a threshold matter, the United States is unaware of any exculpatory Brady material pertaining to Christina Korbe stemming from the investigation and prosecution of United States v. Anthony Terry, et al., Criminal No. 08-365. Christina Korbe is not a charged defendant in Terry.

With respect to that case, on November 12, 2008, a Superseding Indictment was returned by the Grand Jury charging 35 defendants with violating Title 21, United States Code, Sections 846, 841(a)(1), 841(b)(1)(A)(iii), 841(b)(1)(B)(ii) and 841(b)(1)(C), and Title 18, United States Code, Section 2. See Criminal No. 08-365, Doc. No. 48.

To date, 18 defendants in that case have pleaded guilty. As explained during those change of plea hearings (which are a matter of public record), the charges in the Superseding Indictment are the result of a large-scale, multi-agency investigation of drug-

trafficking in the Brookline/Beltzhoover/Mount Washington areas of Pittsburgh, Pennsylvania.  The FBI, DEA, and Pittsburgh Bureau of Police (as well as other agencies) joined forces in an investigation that began with a series of controlled purchases of cocaine from targets of the investigation.  Beginning in October 2007, agents utilized confidential informants to purchase cocaine (in amounts ranging from $40 to $3,800) from 2 charged defendants; those controlled buys are charged in Counts 2 through 9 of the Superseding Indictment.

The investigation culminated in Title III wiretap intercepts on 5 cellular telephones spanning the time frame of May 2008 to September 18, 2008.  The 5 cellular telephones were utilized by Nicholas Mihelcic, Anthony Terry, Jamill Denson, and Victor Nelson.  The wiretaps confirmed that Terry and his co-conspirators were obtaining large quantities of cocaine, cooking some of it up into crack, and distributing it throughout the greater Pittsburgh area.  The wiretaps further confirmed that Terry and his co-conspirators also were fraudulently obtaining prescriptions for oxycontin, percocet, vicodin, and xanax, and then distributing those drugs illegally.

In mid-September 2008, agents intercepted calls revealing that the organization anticipated receiving a shipment of cocaine shortly.  On September 18, 2008, agents arrested Terry, Denson, and Nelson and charged them in a criminal complaint.  See Criminal No. 08-365, Doc. No. 1.  The arrest occurred prior to the arrival

of the cocaine, however, and the source of supply (who had not yet arrived in Pittsburgh) did not follow through with the cocaine delivery (approximately 10 to 15 kilograms).  That evening, agents executed search warrants and seized a wealth of evidence, including over $150,000 in cash (the planned payment for the drugs), extensive drug-trafficking paraphernalia, a firearm, and bullet-proof vests.

Count 1 of the Superseding Indictment charges 32 defendants with Conspiracy to distribute 5 kilograms or more of cocaine, a Schedule II controlled substance, and 50 grams or more of cocaine base, in the form commonly known as crack, a Schedule II controlled substance, from October 2007 to September 2008, in violation of 21 U.S.C. § 846.

Count 27 of the Superseding Indictment charges 15 of those same defendants, as well as 3 additional individuals, with Conspiracy to acquire and obtain possession of a controlled substance by misrepresentation, fraud, forgery, deception and subterfuge, and to distribute and possess with the intent to distribute quantities of oxycontin, percocet, vicodin, and xanax, Schedule II, III, and IV controlled substance, from June 2007 to August 2008, in violation of 21 U.S.C. § 846.

The remaining counts of the Superseding Indictment (Counts 2 through 26) contain substantive cocaine and crack offenses related to Count 1 – either controlled buys of cocaine (explained above)

or the most obvious drug deals that were intercepted during the aforementioned wiretaps.

Christina Korbe's husband (Robert) is a charged defendant in the Terry case. Robert was intercepted solely during the wiretap of Nicholas Mihelcic's cellular telephone (Target Telephone #1). The United States is unaware of any exculpatory information (or, for that matter, properly discoverable information pursuant to Fed. R. Crim. P. 16) pertaining to Christina Korbe in connection with the wiretap on Target Telephone #1, or in connection with the remainder of the investigation and prosecution of the Terry defendants.

Nevertheless, in an effort to accommodate at least a portion of the requests set forth in the instant discovery motion, the United States has provided copies of the following materials to defense counsel:  all of the intercepted calls from Target Telephone #1; a list of the Call Sessions that (to date) have been identified as calls pertaining to Robert Korbe (including calls during which he is discussed); and copies of the Applications and Affidavits for Search Warrants that were executed at the conclusion of the Anthony Terry wiretap investigation.  The United States believes that the aforementioned materials will assist Korbe's counsel in better understanding the wiretap investigation and the manner in which Korbe's husband (Robert) came to the attention of law enforcement during the wiretap intercepts.

40

The case against Christina Korbe, however, is separate from the Anthony Terry wiretap prosecution.  Christina Korbe was not intercepted during those wiretaps, and (as noted above) she is not a charged defendant in that case.

Rather, the drug charges against Christina Korbe are very simple and straightforward – they stem from her relationship with her husband Robert.  At trial, the government intends to prove that she has been aware of the cocaine-trafficking activities of her husband since at least 1990, and that she participated in, and benefitted from, those activities in a variety of ways.  First, throughout those years, the Korbes stored cocaine at their residence (and on November 19, 2008, at least 360.5 grams of powder cocaine and 161.6 grams of cocaine base were stored in the basement of their home).  Second, throughout those years, the Korbes distributed cocaine to others at their residence (as well as elsewhere).  Third, Christina Korbe took steps (including issuing threats) to protect the drug-trafficking activities from detection and prosecution by law enforcement, and she warned Robert about those whom she believed might be cooperating with the authorities.

The motive for the drug-trafficking, as with most drug-traffickers, was money – i.e., the Korbes were able to live beyond their legitimate means.  Another motive for the drug-trafficking was to fuel the Korbes' own cocaine addictions; from 1990 until

November 19, 2008, Christina and Robert Korbe regularly consumed large quantities of cocaine on an ongoing basis (and on November 19, 2008, "coke" was in Christina Korbe's "blood," and drug use paraphernalia was seized from her bedroom).

Accordingly, the drug conspiracy charged in the instant Superseding Indictment is vastly different than the drug charges in the <u>Terry</u> prosecution.  Not all drug-trafficking conspiracies are the same.  Some involve only the importation of large, multi-kilogram quantities of drugs into the United States; some involve the transportation, processing, packaging and distribution of kilogram and/or multi-ounce quantities of drugs; some simply involve the distribution of drugs.  Not all individuals involved in all types of drug-trafficking conspiracies know one another.  **And, most importantly, not even all individuals involved in the <u>same</u> conspiracy are required to know one another**.  <u>See</u> <u>United States v. Gibbs</u>, 190 F.3d 188, 197 (3d Cir. 1999) ("The government need not prove that each defendant knew all of the conspiracy's details, goals, or other participants.).

For these reasons, the mere failure of one individual involved in drug trafficking to know about and/or mention the drug activities of another individual is not "exculpatory" information; stated differently (and more broadly), the fact that an individual indicates no knowledge of criminal activity by a defendant does not constitute exculpatory evidence.  At best, it is "neutral" information, and <u>Brady</u> does not require the government to obtain

and/or disclose that type of information.  See, e.g., United States
v. Brown, 595 F.3d 498, 513 (3d Cir. 2010) (evidence which is "at
best, neutral as to [a defendant's] guilt or innocence" is not
exculpatory Brady material); accord Andrews v. Collins, 21 F.3d
612, 626 (5th Cir. 1994) ("[a]lthough exculpatory and impeachment
evidence falls within the purview of Brady, neutral evidence does
not"; evidence that a witness could not identify the defendant is
neutral and not exculpatory); United States v. Dillman, 15 F.3d 384
(5th Cir. 1994) (grand jury testimony from witness who could not
recall or remember alleged meeting held neutral evidence and not
Brady material); United States v. Bryan, 868 F.2d 1032, 1037 (9th
Cir. 1989) (rejecting defense claim that trial court erred by
refusing to order production of statements of class of fraud
victims who did not report that he made certain statements;
"neither law nor logic" supports proposition that any information
gleaned from any witness that does not incriminate the defendant
necessarily exculpates him).

Finally, with respect to Korbe's request for production of
statements made by her husband Robert that could be "favorable" to
her within the meaning of Brady, the United States objects.  It is
well settled that Brady does not require the government to produce
information that is known to the defendant.  United States v.
Starusko, 729 F.2d 256, 262 (3d Cir. 1984) ("'the government is not
obliged under Brady to furnish a defendant with information he
already has or, with reasonable diligence, he can obtain himself'")

(citation omitted).[13]  Christina Korbe is married to Robert Korbe. She, better than anyone, should know what Robert Korbe does or does not know about her involvement with illegal drugs.

By way of further response, it is the understanding of the United States that Robert Korbe denies that his wife was involved in illegal drug activities.  Defendant Christina Korbe is aware of this.  In addition, it is the government's well-founded belief that defense counsel for Christina Korbe has had unfettered access to Robert Korbe, and that Christina Korbe's counsel has met with Robert Korbe more than once.  Brady simply does not require the government to provide information that is known and available to a defendant.

**F.  Defendant's Specific Brady Request Re: Separate and Distinct Criminal Activities of Robert Korbe (Doc. No. 97)**

In this motion (Doc. No. 97), Korbe acknowledges that her husband Robert "may have been involved" in illegal drug activity over the years.  See Doc. No. 97, p. 1.  Korbe states, however, that Robert "has endeavored to keep his personal and family life separate from whatever involvement he may have had in illegal

---

[13]  Accord Moore v. Quarterman, 534 F.3d 454 (5th Cir. 2008) ("It is consequently not debatable that the government's failure to inform Moore of Huel's statement did not violate Brady, because Huel only gave the police information that, if true, Moore should have already known or should have obtained by his own reasonable investigation."); United States v. Graham, 484 F.3d 413, 417 (6th Cir. 2007) (no Brady violation if defendant knew or should have known the essential facts permitting him to take advantage of the information in question, or if the information was available to him from another source).

activity."   Id.   Korbe believes that Robert "has on various occasions made statements to others, taken actions to secrete his activities, and otherwise behaved in such a way that he has made it clear to others, including law enforcement, that he did not want his wife to have any knowledge about a number of activities that he had been involved in – both illegal activities and those that may be legal but are unsavory."   Id., pp. 1-2.   Based on these presuppositions, Korbe requests production of a host of materials that she believes are "favorable to her" and/or which "affects the credibility of the government's case."   Id., p. 2.   See Request Nos. 1-5 (set forth at pp. 2-5).   The United States objects.

With this motion, Korbe asks the Court to assume the plausibility of a contention that is directly refuted by the facts. In particular:   Robert Korbe has three (3) prior felony drug convictions which stem from arrests in 1991 and 1995.   Christina Korbe was present during the first arrest in 1991 (she was arrested as well), and cocaine, a scale and a firearm were seized.[14]   Robert Korbe's most recent state court arrest was on May 16, 2008.   He was charged with aggravated assault against a police officer, resisting arrest, felony and misdemeanor drug charges (and other offenses).[15]

---

[14]   See Doc. No. 1 (Criminal Complaint Affidavit for Christina Korbe), pp. 7-8.

[15]   See Docket Sheet for Docket No. CP-02-CR-0012403-2008, Court of Common Pleas of Allegheny County (a copy of which is attached hereto as Exhibit D).

That same day, Christina Korbe posted the bond in order to secure Robert's pretrial release.[16]    Thereafter, Robert Korbe was intercepted on the federal wiretap of Nicholas Mihelcic's cellular telephone.  On November 19, 2008 – while Robert was on bond for the pending state court felony drug charges[17] – Christina Korbe had over 500 grams of cocaine and cocaine base (worth $14,000 to $16,000) in her home.  She had "coke" in her "blood."  Drug use paraphernalia was seized from her bedroom.  And in the days immediately following her arrest, Christina Korbe stated that it was her belief that Gino Riccelli and Joshua Foriska (drug-trafficking associates and co-defendants of Robert) had cooperated with law enforcement, and hence were responsible for the presence of law enforcement at her home on the morning of November 19, 2008.[18]  In her words: "I told Bob, I told Bob about them.  I said, I guarantee you, Bob, they turned on you."  Id.

If Robert Korbe claims that he kept Christina Korbe separated from, and unaware of, the illegal drug activity, the evidence already of record in this case directly refutes that contention.

_____

[16]  See Bail Bond Receipt (copy attached hereto as Exh. E).

[17]  On February 11, 2010, Robert Korbe pled guilty to all of the state charges, and he is awaiting sentencing.  See Docket Sheet for Docket No. CP-02-CR-0012403-2008, Court of Common Pleas of Allegheny County (copy attached hereto as Exhibit D).

[18]  See Doc. No. 140, pp. 21-22, and Transcript of portion of recorded call on November 21, 2008, 1:58 p.m. (Gov. Exh. 2 from Detention Hearing), which is attached hereto as Exhibit A.

The United States is unaware of any exculpatory _Brady_ information as to Christina Korbe with respect to the purportedly "separate and distinct criminal activities of Robert Korbe." Robert Korbe – as with all drug traffickers – most likely did not share all of his drug-trafficking information with all of his drug-trafficking associates.  The law recognizes that drug traffickers rarely do this.  _See_ _Gibbs_, 190 F.3d at 197 ("The government need not prove that each defendant knew all of the conspiracy's details, goals, or other participants.").  In addition, as explained in detail above, the fact that an individual indicates no knowledge of criminal activity by a defendant does not constitute exculpatory evidence.  At best, it is "neutral" information, and _Brady_ does not require the government to obtain and/or disclose that type of information.

And finally (as explained above), with respect to Korbe's request for production of statements made by her husband Robert that purportedly could be "favorable" to her, _Brady_ does not require the government to provide information that is known and available to a defendant.

### G.   Defendant's _Brady_ Motion Re: Experiments, Tests, Measurements, Etc. (Doc. No. 101)

In this motion (Doc. No. 101), Korbe requests production of all "experiments, test, re-enactments, and results from all law enforcement sources ... whether they were formal or informal, which were conducted" at the Korbe residence.  She further requests a

list of "all law enforcement officers who went to the scene and had access to the interior" of the Korbe residence.

Korbe believes that agents may have conducted "informal tests regarding the issue of what the defendant, Christina Korbe, could have or should been able to see and hear when she was awakened by law enforcement officers at her door on November 19, 2008 ..." She posits that "the results of such informal tests would be exculpatory." Korbe is incorrect.

First, as explained above, in fulfillment of its obligations under Fed. R. Crim. P. 16 and Local Criminal Rule 16, the United States already has provided defendant with copies of reports of relevant scientific tests and examinations.[19] <u>See</u> <u>also</u> Response by United States to Korbe's Motion for Disclosure of Expert Witnesses, Opinions, Bases and Reasons of Opinions and Qualifications (Doc. No. 99), which is being filed contemporaneously herewith.

The United States is unaware of the results of any tests – formal or informal – which are exculpatory as to Korbe and/or which would tend to support the defense of self-defense or justifiable homicide. To the contrary, the one "informal test" that was done by Allegheny County Homicide detectives is inculpatory. The results of the "informal test" were memorialized, and that report has been provided to defense counsel.

---

[19] The United States notes that the list of "lab results, measurements, etc." set forth at pages 1 through 3 of Korbe's motion (Doc. No. 101) is not a complete list of all test results provided by the government to Korbe.

Finally, the United States objects to Korbe's request for a "listing of all law enforcement officers who went to the scene." The request seeks information that is beyond the scope of pretrial discovery in a criminal action.

### H.   Motion for Discovery of Statements of Co-Conspirators (Doc. No. 95)

Korbe requests production of "any statements of any co-conspirators in the instant case that the government intends to offer against her" at trial.  The United States objects.

The law is well-settled that statements by third parties, whether alleged co-conspirators, prospective government witnesses, or individuals whose statements can be attributed to a defendant for evidentiary purposes, do not come within the ambit of Rule 16, and are not required to be disclosed in pretrial discovery.  United States v. Rivera, 6 F.3d 431, 439 (7th Cir. 1993) (proper to deny discovery of statements made by co-defendant during unsuccessful plea negotiations because statements of co-defendant are not subject to Rule 16 discovery); see also United States v. Mayberry, 896 F.2d 1117, 1122 (8th Cir. 1990) ("The language of [Rule 16(a)(1)(A)] applies only to statements made by the defendant"; government had no obligation to provide pretrial discovery of statement by co-conspirator government witness) (emphasis in original); United States v. Tarantino, 846 F.2d 1384, 1418 (D.C. Cir. 1988) ("[W]e think it clear that as used in Fed. R. Crim. P.

16(a)(1)(A) the phrase 'statements made by the defendant' does not include statements made by co-conspirators of the defendant, even if those statements can be attributed to the defendant for purposes of the rule against hearsay."); In re United States, 834 F.2d 283, 284-87 (2d Cir. 1987) (oral statements made by defendants and coconspirators to persons other than known government agents, which had been memorialized at some point in one form or another, and which government planned to offer at trial, were not discoverable, as Jencks Act controls production of statements of government witnesses; reversible error to allow discovery of co-conspirator's statements to government agent because such statements are governed by the Jencks Act and disclosure would undermine witness protection); United States v. Orr, 825 F.2d 1537, 1541 (11th Cir. 1987) ("Rule 16(a)(1)(A) does not apply to co-conspirator's statements."); United States v. Roberts, 811 F.2d 257, 258-59 (4th Cir. 1987) ("The plain language of Fed. R. Crim. P. 16(a)(1)(A) pertains to the discovery of statements 'made by the defendant.' The rule does not mention and is not intended to apply to the discovery of statements made by co-conspirators. Such statements are more properly governed by the Jencks Act."). See also Fed. R. Crim. P. 16(a)(2) ("Nor does this rule authorize the discovery or inspection of statements made by prospective government witnesses except as provided in [the Jencks Act].").

Rule 801(d)(2)(E) of the Federal Rules of Evidence governs the admissibility of co-conspirators statements (not Rules 804, 805 and

807, which are cited in Korbe's motion).   Rule 801(d)(2)(E) does not have an "advance notice" requirement.[20]

###    I.    Motion for Pretrial Production of Statements of Individuals Not To Be Called As Witnesses (Doc No. 107)

Korbe requests "that the government disclose the names and addresses of all individuals who the government has decided it will not call as witnesses during the trial of this cause and for all other relief, just and proper in the premises." See Doc. No. 107, p. 4.  Korbe's request purportedly "is grounded on the government's constitutional obligations to disclose exculpatory information, including impeachment material, to the defendant." Id., p. 1.  The United States objects.

As explained above, Fed. R. Crim. P. 16(a)(2) provides:

> **Information not Subject to Disclosure.** Except as Rule 16(a)(1) provides otherwise, this Rule does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in

---

[20]   As an aside, the United States is aware of the advance notice requirements relating to evidence that may be offered pursuant to Fed. R. Evid. 807 (the "residual exception" to the hearsay rules); the government intends to comply with those requirements.  At this time, however, the United States is not aware of any such evidence that will be offered at trial.  The government requests, to the extent that any evidence subject to Rule 807 comes to light, that it be allowed to provide notice at the time it provides its Rule 404(b) notice – two weeks prior to trial.  See Response by United States to Korbe's Motion to Provide Defendant with a Statement of Uncharged Misconduct Evidence (Doc. No. 98), filed contemporaneously herewith.

connection with investigating or prosecuting the case....

In <u>Riley v. Taylor</u>, 237 F.3d 300 (3d Cir. 2001),[21] the Third Circuit briefly summarized the rules established by <u>Brady v. Maryland</u>, 373 U.S. 83 (1963) and its progeny, stating:

> In <u>Brady</u>, the Supreme Court held that 'the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.' <u>Id.</u> at 87, 83 S.Ct. 1194.  To state a valid <u>Brady</u> claim, a plaintiff must show that the evidence was (1) suppressed, (2) favorable, and (3) material to the defense. See <u>United States v. Perdomo</u>, 929 F.2d 967, 970 (3d Cir. 1991).  Evidence is material if there is reasonable probability that the outcome would have been different had the evidence been disclosed to the defense.  See <u>United States v. Bagley</u>, 473 U.S. 667, 678, 105 S.Ct. 3375.

<u>Riley</u> at 322.  It is therefore clear that the government cannot be required to disclose a statement of a witness whom the government does <u>not</u> intend to call unless that statement contains evidence that is (1) favorable to the defense (including impeachment materials regarding witnesses who <u>are</u> called by the government), and (2) material to the defense.

In <u>United States v. Agurs</u>, 427 U.S. 97 (1976), the Supreme Court stated that the prosecution is "under no duty to report *sua*

---

[21] This opinion was vacated on other grounds on rehearing <u>en banc</u> at 237 F.3d 348, and then reinstated in part at 277 F.3d 261.

*sponte* to the defendant all that they learn about the case and about their witnesses... [T]here is no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case." <u>Agurs</u> at 104. (citations omitted).

The government is aware of its responsibility to disclose exculpatory material that would be favorable and material to the defense. The government also acknowledges that, to the extent that it is aware of evidence that would tend to impeach the testimony or credibility of witnesses whom it <u>does</u> intend to call, such impeachment materials must be turned over so that the defense can effectively cross-examine the government witnesses. The government intends to disclose any and all such impeachment materials in conjunction with the early disclosure of the Jencks materials (discussed above).

Based on the foregoing, Korbe's motion for pretrial production of statements of individuals not to be called as witnesses should be denied.


### J.   Motion for Full Disclosure of Redacted Documents (Doc No. 102)

In this motion, Korbe explains that some of the discovery materials provided to her have been redacted, and that 3 documents appear to have been redacted. <u>See</u> Doc. No. 102, pp. 1-2, Items 1 through 21 (documents identified by the government as "redacted"),

and Items 1 through 3 (documents with areas that appear to be redacted). Korbe requests "immediate disclosure of any and all redacted information that has been redacted in any fashion from any and all documents provided in discovery." Id., p. 4. In the alternative, Korbe requests production by the government of a "redaction log," and an *in camera* review by the Court of the challenged documents. Korbe's requests should be denied.

A defendant is not entitled to full disclosure of the government's investigative reports. Instead, Rule 16 delineates the categories of information and materials that must be produced pretrial. One such category is the defendant's statements – in particular, defendant's statements that are in written or recorded form (including grand jury testimony) and any oral statement given by the defendant to a person then known by the defendant to be a government agent. See Fed. R. Crim. P. 16(a)(1)(A) & (B).

The majority of the contested documents listed in Korbe's motion (Doc. No. 102) are investigative reports of law enforcement witnesses who will testify at trial. Many of the reports contain statements which Korbe made to a person whom she knew to be a government agent. Some of the reports explain the seizure of evidence from an area where Korbe has an arguable expectation of privacy (i.e., events that could conceivably form the basis for a motion to suppress). Pursuant to Rules 12 and 16 of the Federal Rules of Criminal Procedure, Korbe is entitled to the pretrial disclosure of this information.

The reports, however, also contain other investigative material.   Korbe is not entitled to pretrial disclosure of those portions of the reports.   See Fed. R. Crim. P. 16(a)(2).   Instead, copies of the complete, "un-redacted" reports will be provided with the Jencks Act materials at the time of trial.

The United States hereby responds in further detail with respect to each of the documents listed in Korbe's motion:

Documents "identified by the government as being redacted" –

1.   This is an investigative report of a law enforcement witness that, in part, contains information regarding the transportation of Christina Korbe (following her arrest) and the seizure of certain evidence from Korbe (gun shot residue).   That portion of the report (including the context within which the evidence  was seized) has been provided.   The remainder of the report (which contains other investigative information) is not discoverable at this time.   The United States will provide Korbe with a complete, "un-redacted" copy of this report with the Jencks Act materials.

2.   This is an investigative report of a law enforcement witness that, in part, contains information regarding the "protective sweep" of the Korbe residence (following the shooting of Special Agent Hicks) and statements made by the defendant.   Those portions of the report have been provided.   The remainder of the report (which contains other investigative information) is not discoverable at this time.   The United States will provide Korbe with a complete, "un-redacted" copy of this report with the Jencks Act materials.

3.   Same as 2 above.

4.   Same as 2 above.

5.   Same as 2 above.

6.   Same as 2 above.

7.   Same as 2 above.

8.  This report contains an interview of a medical doctor who provided care and treatment to Christina Korbe.  The doctor's personal identification and contact information have been redacted.  In addition, the internal FBI case file number has been redacted.  Defendant does not need (and is not entitled to) that information.

9.  This report contains an interview of a nurse who provided medical care and treatment to Christina Korbe.  The nurse's personal identification and contact information have been redacted.  In addition, the internal FBI case file number has been redacted.  Defendant does not need (and is not entitled to) that information.

10. This report contains an interview of a medical doctor who provided care and treatment to Christina Korbe.  The doctor's personal identification and contact information have been redacted.  In addition, the internal FBI case file number has been redacted.  Defendant does not need (and is not entitled to) that information.

11. This is an investigative report of a law enforcement witness that, in part, contains information regarding two searches of the Korbe residence in 1995, and the presence of Christina Korbe during the execution of those searches.  Those portions of the report have been provided.  The remainder of the report (which contains other investigative information) is not discoverable at this time.  The United States will provide Korbe with a complete, "un-redacted" copy of this report with the Jencks Act materials.

12. This is an investigative report of a law enforcement witness that, in part, contains information regarding Christina Korbe's behavior and statements during her arrest (and the arrest of her husband Robert) in 1991.  That portion of the report has been provided.  The remainder of the report (which contains other investigative information) is not discoverable at this time.  The United States will provide Korbe with a complete, "un-redacted" copy of this report with the Jencks Act materials.

13. This is an investigative report of a law enforcement witness that, in part, contains information regarding one of the searches of the Korbe residence in 1995, and the presence of Christina Korbe during the execution of that

search.  Those portions of the report have been provided.
The remainder of the report (which contains other
investigative information) is not discoverable at this
time.  The United States will provide Korbe with a
complete, "un-redacted" copy of this report with the
Jencks Act materials.

14. This is an investigative report of a law enforcement
witness that, in part, contains information regarding
statements made by Christina Korbe on November 19, 2008.
That portion of the report has been provided.  The
remainder of the report (which contains other
investigative information) is not discoverable at this
time.  The United States will provide Korbe with a
complete, "un-redacted" copy of this report with the
Jencks Act materials.

15. This is an investigative report of law enforcement
witnesses that, in part, contains information regarding
the execution of a search at the Korbe residence on
September 15, 1995, and the presence of Christina Korbe
during the execution of that search.  Those portions of
the report have been provided.  The remainder of the
report (which contains other investigative information)
is not discoverable at this time.  The United States will
provide Korbe with a complete, "un-redacted" copy of this
report with the Jencks Act materials.

16. This is an investigative report of law enforcement
witnesses that, in part, contains information regarding
the execution of a search at the Korbe residence on
August 2, 1995, and the presence of Christina Korbe
during the execution of that search.  Those portions of
the report have been provided.  The remainder of the
report (which contains other investigative information)
is not discoverable at this time.  The United States will
provide Korbe with a complete, "un-redacted" copy of this
report with the Jencks Act materials.

17. This is an investigative report of a law enforcement
witness that, in part, contains information regarding
statements made by Christina Korbe on November 19, 2008.
That portion of the report has been provided.  The
remainder of the report (which contains other
investigative information) is not discoverable at this
time.  The United States will provide Korbe with a
complete, "un-redacted" copy of this report with the
Jencks Act materials.

18. This report contains an interview of a caseworker with Allegheny County Division of Children, Youth and Family Services. The caseworker's personal identification and contact information have been redacted. In addition, the internal FBI case file number has been redacted. Defendant does not need (and is not entitled to) that information.

19. Same as 18 above.

20. This is an investigative report of a law enforcement witness that, in part, contains information regarding statements made by Christina Korbe on November 19, 2008. That portion of the report has been provided. The remainder of the report (which contains other investigative information) is not discoverable at this time. The United States will provide Korbe with a complete, "un-redacted" copy of this report with the Jencks Act materials.

21. This is a report from the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) that, in part, contains information regarding the "trace" of the Taurus revolver utilized by Christina Korbe on November 19, 2008 (i.e., the date and location of the purchase of the firearm by Korbe). The report also contains the findings by ATF that Robert Korbe is a convicted felon, and that he has not been granted a pardon and/or has not otherwise been granted relief or restoration of his right to possess a firearm. Those portions of the report have been provided. The remainder of the report (which contains other investigative information) is not discoverable at this time. The United States will provide Korbe with a complete, "un-redacted" copy of this report with the Jencks Act materials.


Documents with "areas that appear to be redacted" –

1. The United States has provided another copy of this report to Korbe. Nothing has been redacted from the report.

2. The United States has provided another copy of this report to Korbe. Nothing has been redacted from the report.

3. This is an investigative report of a law enforcement witness that contains statements of the defendant. The agent's date of birth has been redacted. In addition, the internal FBI file number has been redacted. Defendant does not need (and is not entitled to) that information.

Based on the foregoing, Korbe's Motion for Full Disclosure of Redacted Documents (Doc. No. 102) should be denied.

## III.   **Request for Disclosure of Evidence by Defendant**

The United States hereby requests disclosure by defendant of all evidence and information subject to disclosure pursuant to Fed. R. Crim. P. 16(b)(1).

Respectfully submitted,

ROBERT S. CESSAR
Acting United States Attorney

s/Troy Rivetti
Troy Rivetti
Assistant U.S. Attorney
U.S. Post Office & Courthouse
Suite 4000
Pittsburgh, PA  15219
(412)644-3500 (Phone)
(412)644-2645 (Fax)
Troy.Rivetti@usdoj.gov
PA ID No. 56816

s/Linda L. Kelly
LINDA L. KELLY
Assistant U.S. Attorney
U.S. Post Office & Courthouse
Suite 4000
Pittsburgh, PA  15219
(412)644-3500 (Phone)
(412)644-2645 (Fax)
Linda.Kelly@usdoj.gov
PA ID No. 21032

s/Donovan J. Cocas
DONOVAN J. COCAS
Assistant U.S. Attorney
U.S. Post Office & Courthouse
Suite 4000
Pittsburgh, PA  15219
(412)644-3500 (Phone)
(412)644-2645 (Fax)
Donovan.Cocas@usdoj.gov
PA ID No. 203831