IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | |
| | ) | 2:09-cr-05 |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| CHRISTINA MARIE KORBE, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER OF COURT

Pending now before the Court is DEFENDANT'S MOTION TO SUPPRESS NOVEMBER 19, 2008 STATEMENT TO LAW ENFORCEMENT OFFICERS WHILE DETAINED AT THE ALLEGHENY COUNTY POLICE DEPARTMENT (Document No. 91), the government's brief in opposition (Document No. 159), Defendant's brief in support to the motion to suppress (Document No. 189), the governments's response to Defendant's brief in support (Document No. 192), and the government's notice regarding a recent Supreme Court decision with supplemental authority in support of its response (Document No. 195). On April 15, 2010, an evidentiary hearing was ordered to consider Defendant's motion, and the hearing was conducted on May 4, 2010. All parties were represented by counsel who presented and argued the issues skillfully and effectively. The motion is now ripe for disposition.

Defendant moves to suppress the statements made by her while being interviewed by detectives from the Allegheny County Police Department homicide unit because, as she avers, her constitutional rights against self-incrimination and to counsel, as protected under the Fifth Amendment and the Due Process Clause of the Fourteenth Amendment, were violated. More particularly, Defendant argues that the law enforcement officers who conducted the interview did not honor her request for counsel, and further that any statement(s) provided were involuntary as a result of the conditions of her confinement before and during the course of her interview. (Document No. 91 at 3 - 4).

**FINDINGS OF FACT**

This criminal case arose out of the tragic shooting of Special Agent Samuel Hicks of the Federal Bureau of Investigation("FBI") shortly after 6:00 a.m. on November 19, 2008. On that date, Hicks and other law enforcement officers were attempting to execute an arrest warrant for Robert Ralph Korbe at the family home, which he shared with his wife, Christina Korbe ("Defendant") and their two young children. On November 19, 2008, at approximately 7:00 a.m., Defendant was taken into custody and transported to the Indiana Township Police Department in Allegheny County. At approximately 9:06 a.m., Defendant was transported to the Allegheny County Police Department for questioning. After being interviewed by officers, Defendant was arrested at approximately 11:25 a.m.

During the evidentiary hearing, testimony was received from FBI Special Agent Patrick McGlennon, Allegheny County Detectives Greg Matthews and Michael Garlicki, Officers Daniel Nudi and Mark Myers of the Indiana Township Police Department, and Officer Amanda Duncan of the Harmar Township Police Department. The Court also received stipulations of expected testimony from Special Agent Vijay Nemani with the U.S. Drug Enforcement Agency, Depul Garg, M.D., and Michaelene Forrester, R.N. The Court admitted into evidence the following exhibits: government exhibits A (a video recording of Defendant as she was held at the Indiana Township Police Department) and B (a copy of the Allegheny County Police form R12 executed on November 19, 2008), and Defendant's exhibits 1 (a copy of Defendant's arrest report), 2 (a copy of Special Agent McGlennon's handwritten notes taken during Defendant's interview), 3 (diagram drawn by hand during Defendant's interview), 4 (Allegheny County police report authored by Detective Miller), and 5 (photograph of the Korbe residence). Based upon the testimony and evidence presented during the suppression hearing and applicable law, the Court issues the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Criminal Procedure 12(d). For the reasons that follow, the Court will deny the Defendant's motion.

1. On November 19, 2008, Defendant was interviewed by Allegheny County

Detectives Matthews and Miller and FBI Special Agent Patrick McGlennon at the Allegheny County Police Headquarters.[1]

2. Defendant arrived at the Allegheny County Police Department headquarters at approximately 9:00 a.m.

3. The interview of Defendant began at approximately 10:07 a.m.

4. During the time between her arrival at the headquarters and the start of the interview, Defendant was afforded the opportunity to use the restroom, and the clothes she was wearing were exchanged for a jumpsuit.

5. Shortly after shooting Special Agent Hicks, but before being taken into custody by the police that morning, Defendant telephoned the Allegheny County 911 Center and gave a description of what was occurring. That call was recorded.

6. Prior to interviewing Defendant at the Allegheny County Police headquarters, Detective Matthews and Special Agent McGlennon listened to the 911 recording. The Allegheny County 911 Center is located in the same complex as the Allegheny County Police Department.

7. The interview of Defendant occurred in Interview Room No. 2, a room approximately ten feet by ten feet in dimension, well lighted, and was furnished with a grey metal grey desk in the center and several chairs.

8. Four people were present during the course of the interview, Defendant, Detectives Matthews and Miller, and Special Agent Patrick McGlennon.

9. Defendant was seated at the desk with her back to the door.

10. The temperature in the interview room was comfortable and was consistent with the temperature throughout the police headquarters.

11. The three officers were seated across from Defendant, with Detective

---

[1] At that point, the Allegheny County Police Department was the lead investigative agency. Special Agent McGlennon asked the Allegheny County detectives if he could be present in the room during the interview, a request that was granted.

Matthews sitting at the desk directly across from her, Special Agent McGlennon behind and to the right of Detective Matthews, and Detective Miller seated to the left of Detective Matthews at the corner of the table.

12. Defendant wore no handcuffs during the interview, but one leg was shackled to a spot on the floor in front of the desk.

13. Prior to the start of the interview, Defendant was offered food, drink, and facial tissues. Defendant declined the offer of food, but accepted a cup of water and tissues.

14. Prior to the start of the interview, Defendant was advised that a restroom was available for her use if she so requested. Defendant did not request to use the restroom at that point, nor did she request to use the restroom during the course of the interview.

15. Before taking a seat at the start of the interview, Defendant advised the officers that she had a "prior back problem", and asked to be seated for the interview in a chair that supported her back. A chair with a cushioned seat and a cushioned back was provided, and Defendant made no further reference to her back problem or the type of chair in which she was seated. Defendant did not indicate that she was suffering from back pain at the start of, or during, the interview. Defendant's reference to this condition was expressed in a context that it was one that she incurred at some undefined point prior to the day's events.[2]

16. Prior to the start of the interview, Defendant was advised of her constitutional rights as those rights were iterated by the Supreme Court in *Miranda v.*

---

[2] The phrase "prior back problem" is taken from the testimony of Special Agent McGlennon. The nature, severity, or more detailed description of said back problem was not further developed in the record. Beyond the exchange of the chair that occurred prior to the Defendant actually sitting down, there is no evidence in the record that Defendant's self-reported back condition had any effect of the interview, nor was there any evidence of any pain or discomfort in the course of the interview.

*Arizona*, 384 U.S. 436 (1966)(Defendant's "*Miranda* rights") through Allegheny County Police Department form R12, a single page, written form.

17. Paragraphs 1 through 4 on the upper portion of the form provides the following advisements: that Defendant had the right to remain silent; Defendant was informed that anything she said can and would be used against her in a court of law; that she had the right to have an attorney present; and that an attorney would be appointed for her in the event that she could not afford one. These advisements were read aloud to Defendant.

18. Paragraph 5 of the form was a question "Do you understand each of these rights I've explained to you? Yes or no."

19. That question was read aloud to Defendant, who responded in the affirmative that she did understand each of the rights listed in paragraphs 1 through 4.

20. Paragraph 6 read, "Having these rights in mind, do you wish to speak to me now? Yes or no."

21. That question was read aloud to Defendant, who responded in the affirmative that she was willing to speak with the officers.

22. After Defendant verbally responded to the questions at paragraphs 5 and 6, she was given the form to sign.

23. On the form below question 6, Defendant hand wrote "Briefly, then I want my attorney present for the rest of the interview", and she initialed the form.

24. The bottom of the form was signed by Defendant and Detectives Matthews and Miller, who noted the time at which the form was signed, 10:07 a.m.

25. During the time in which the form was read aloud, completed, and signed by Defendant, she was not threatened or intimidated in any way by any of the officers to sign the form.

26. Defendant appeared to the officers to be calm at the time the waiver form was read to her and signed. Likewise, she did not appear to be confused regarding what was transpiring.

27. During the time in which the form was read aloud, completed, and signed by Defendant, Detective Miller, who read the form, did not raise his voice or use a firm tone.

28. No promises with respect to favorable treatment from prosecutors or from any court were made to Defendant at the time she executed the form and agreed to speak with the officers.

29. Defendant did not appear to be under any effects of alcohol or narcotics at the time the waiver form was executed.

30. During the time in which the form was read aloud to Defendant, she appeared to understand what was being read to her, and provided oral and coherent responses to the questions at the times when the questions were posed and an answer was expected.

31. During this time, Defendant did not appear to have any mental or physical disability, did not appear to have any physical pain or discomfort, nor did she appear to be tired.

32. Defendant did not demonstrate any reluctance to speak with the officers.

33. Prior to completing the form, Defendant asked two questions, 1) whether she was under arrest, and 2) whether she needed an attorney.

34. Detective Matthews responded by telling Defendant that 1) she had not been charged with any crimes at that time, and 2) the question as to whether she needed an attorney was entirely her decision as none of the officers could give her such advice.

35. None of the three officers otherwise made any attempt to bring pressure to bear on Defendant to agree to talk with them.

36. After Defendant agreed to speak with the officers, Detective Matthews discussed with her the option of whether she would agree to have her statement recorded.

37. More particularly, it was explained to Defendant that after the interview, her

statement could be recorded if she so desired.

38. Defendant responded that she desired not to have her words misconstrued or to be taken out of context, and therefore that she would like to have her statement recorded at the conclusion of the interview.

39. Defendant further noted at that point that she would be comfortable when they got to that point if she had her attorney present at the conclusion of the interview for the recording of her statement.

40. Following this exchange, Defendant agreed for the interview to proceed without an attorney present.

41. At no point did Defendant say or indicate that she did not want to speak to the officers, nor did she ask the officers not to speak with her.

42. The interview of Defendant began at that point, and proceeded for approximately one hour and fifteen minutes.

43. At no point during the interview did any of the officers raise their voices to Defendant, nor did any of the officers use profane language with Defendant.

44. For her part throughout the course of the interview, Defendant's demeanor included points at which she was calm, she cried, she was angry, while at other points she was loud, assertive, and profane.

45. At no point during the interview did Defendant complain about being in any kind of pain.

46. At no point during the interview did any of the officers make any kind of misrepresentation to Defendant in order to induce her to talk.

47. At approximately 11:00 a.m., Defendant was provided with additional facial tissues and water.[3]

---

[3] Detective Miller departed the interview room briefly in order to obtain the water and tissues for Defendant. This was the only point during the interview in which one of the four individuals was not present in the room. Further, no one other than Defendant, Detectives Matthews and Miller, and Special Agent McGlennon were present in the room at any point.

48. At no point did Defendant ask for a break during the interview.

49. During the course of the interview, Detective Matthews, who was seated across from Defendant, would ask questions and was generally the officer who spoke with her.

50. The initial part of the interview consisted of open-ended questions, beginning with some general background before proceeding to ask Defendant to describe what occurred that morning at the Korbe residence.

51. Defendant generally explained the events that led to what occurred.

52. Among other things, Defendant explained that she called 911 from the hallway on the second floor. Defendant insisted that the officers listen to the recording of her 911 phone call because in it she described what occurred.

53. During this initial explanation, however, Defendant did not actually mention or attempt to explain the actual shooting incident.

54. Upon making this initial explanation, Defendant made a comment to the effect that her response was the extent of her statement regarding the events which transpired in her home that morning. However, Defendant did not say at that point anything to the effect that she had nothing further to say, or that she did not want to speak any further with the officers.

55. Detective Matthews informed Defendant that the officers had listened to the recording of her 911 phone call that morning, and noted to Defendant that in responding to their question, she failed to include certain details that were described during the call, including facts such as having a firearm, that a shot was fired, or the actual shooting Special Agent Hicks.

56. At that point, Defendant paused, and stated something to the effect of, "Yeah, I fired a shot. Someone was breaking into my house".

57. After making this statement, Defendant took a deep breath, leaned back in her chair, ran her fingers through her hair, covered her face with her hands, and muttered something to herself.

8

58. Detective Matthews was unable to hear what Defendant said as her hands were covering her face.

59. Special Agent McGlennon believed that he heard Defendant say something to the effect of either, "I think I need my attorney", or "I think I want my attorney", yet he described the comment as an aside and virtually inaudible.

60. The statement muttered by Defendant as she covered her face was not directed to the officers, but apparently to herself.

61. Special Agent McGlennon, who was taking notes throughout the course of the interview, noted Defendant's comment and wrote in the margin of his notes that Defendant's comment was made as an aside, and was said to herself.

62. The next person to speak was Defendant, who began to explain her gun ownership, noting that she had a permit for the firearm, and what type of firearm it was.

63. Defendant further explained her version of the shooting, which continued until approximately 11:25 a.m., the time at which the interview was terminated by her.

64. It was at that point that Detective Matthews once again asked Defendant if she would agree to record her statement. More particularly, Defendant was asked if she would like to step into a different room, one equipped with a microphone, in order to record her statement.

65. Defendant responded that she did not want to make any further statement, or to have a statement recorded, without her attorney present.

66. All questioning ceased at that point, and Defendant was provided with a snack and water, and given the opportunity to use the restroom.

67. At the conclusion of the interview, Defendant was placed under arrest for criminal homicide in violation of 18 Pa.C.S.A. § 2501.

68. Defendant's attorney was contacted by the officers, and was asked to come to the Allegheny County Police Department headquarters.

69. Defendant's attorney informed the officers that he would arrive in the afternoon, which the officers, in turn, informed Defendant.

70. At one point, Defendant inquired about the status of her children.

71. In response to Defendant's inquiry, Detective Matthews placed a telephone call, after which he informed Defendant that her children were being cared for by her father.

72. As she waited for her counsel, Defendant remained in the interview room and was provided with food.

73. Defendant's counsel arrived in the mid-afternoon and met privately with his client for over an hour.[4]

74. Upon the conclusion of the meeting with his client, Defendant's counsel informed the officers that Defendant would not be recording a statement at that time.

75. Counsel for the Defendant departed the headquarters at approximately 5:00 p.m. At that time, neither Defendant nor her attorney made any indication that Defendant was experiencing pain or discomfort.

76. At approximately 6:30 p.m., Defendant indicated that she was experiencing abdominal pains.

77. Paramedics located within the police complex were immediately contacted, responded, and examined Defendant.

78. Following the examination, Defendant was transported via ambulance to the emergency room at Magee-Women's Hospital, arriving at approximately 7:00 p.m.

79. While at the hospital, Defendant was examined and treated for an ovarian cyst. More specifically, Defendant received Dilaudid intravenously while in the

---

[4] Detective Matthews recalled that Defendant's counsel arrived shortly before 3:00 p.m. that afternoon, and that counsel met with Defendant for approximately two hours.

hospital, and was prescribed Vicodin for her pain before being medically discharged. From there, she was subsequently transported to the Allegheny County Jail.

**CONCLUSIONS OF LAW**

The Fifth Amendment to the U.S. Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const., amend V. Anyone "questioned by law enforcement officers after being 'taken into custody or otherwise deprived of his freedom of action in any significant way' must first 'be warned that he has a right to remain silent, that any statement he does make may be used against him, and that he has a right to the presence of an attorney, either retained or appointed.'" *Stansbury v. California*, 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) (*quoting Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)). This now familiar warning, and the rights expressed within the warning, has come to be commonly known as the *Miranda* warning, or *Miranda* rights, in reference to the seminal Supreme Court decision. It is well-established that law enforcement officers must administer *Miranda* warnings whenever a suspect is "taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning." *Miranda*, 384 U.S. at 478-479. *Miranda* prohibits statements derived from police coercion from being offered as evidence against an accused. *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

For *Miranda* rights to attach, the statements made by a defendant must be part of a custodial interrogation. *Illinois v. Perkins*, 496 U.S. 292, 297, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990). "Interrogation" in this context is not limited to police questioning, but also includes "words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 302, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). In determining whether an interrogation occurred, the "analysis focuses 'primarily upon the perceptions of the suspect, rather than the intent of the police.'" *United States v. Brownlee*, 454 F.3d 131, 147 (3d Cir. 2006)(*quoting*

11

*Innis*, 446 U.S. at 301). The government does not challenge the fact that Defendant was in "custody" for *Miranda* purposes at the time of the hereinabove referenced interview.

Individuals can forgo their *Miranda* rights through a knowing, intelligent, and voluntary waiver. *Miranda*, 384 U.S. at 436. Only statements that are voluntary may be admitted into evidence at a criminal trial, and the government has the burden of proving by a preponderance of the evidence that statements were voluntarily given and that it complied with *Miranda*. *Oregon v. Bradshaw*, 462 U.S. 1039, 1044-46, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983)(plurality opinion); *see also United States v. Swint*, 15 F.3d 286, 288-89 (3d Cir.1994). A statement is voluntary when it is the "'product of an essentially free and unconstrained choice by its maker,' that it was 'the product of a rational intellect and a free will,' and that the [maker's] will was not 'overborne.'" *Swint*, 15 F.3d at 289 (*citing United States ex rel. Hayward v. Johnson*, 508 F.2d 322, 326 (3d Cir.1975)). To determine whether a statement made by Defendant is voluntary, the Court is required to examine the totality of the circumstances, including any coercion, the length of the interrogation, the location of the interrogation, its continuity, the maturity of Defendant, her level of education, her physical condition, and her mental health. *Id.* at 289. The crucial factor, however, is whether there was police coercion. *Id.; see also Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) (holding that "coercive police activity is a necessary predicate to the finding that a confession is not voluntary").

The Court finds that the government has satisfied its burden to demonstrate that Defendant knowingly and freely waived her right to remain silent and that her statements to the officers on November 19, 2008 were voluntary. In doing so, her free will was not overborne by the officers. The *Miranda* rights advisement was read aloud to Defendant, and she was provided with the opportunity to review the written form before signing it. Defendant followed along as the rights were explained to her, and she responded appropriately at those times in which a question was asked of her, answering affirmatively when asked whether she understood the rights as they were just explained to her, and further answering affirmatively when asked whether she wanted to speak with the officers.

12

Defendant sat calmly across the table from the two detectives with one leg shackled to the floor. The officers did not yell, hit, kick, or touch Defendant during the interview. She was offered food, drink, and tissues during the interview, and was given the opportunity to use the restroom facilities. Taken as a whole, there simply was no evidence of any circumstance of the interview that overbore Defendant's free will to knowingly waive her right to remain silent.

This is so notwithstanding the evidence of discomfort experienced by Defendant at different times that day. Defendant introduced evidence that while she was held in the Indiana Township police station prior to being transported to the Allegheny County police headquarters, she complained of being cold as she waited in a temporary holding facility. Immediately following this request, Defendant was provided with a sweatshirt to wear, and apparently voiced no other concern regarding the temperature to any of the officers. This mild episode was exclusively limited in time (occurring at approximately 8:30 a.m.) and location (Indiana Township police station), so as to have had no impact upon the subsequent interview. Likewise, it was not until later in the evening that Defendant complained of abdominal pain before receiving medical treatment for an ovarian cyst. Defendant's interview with the officers was completed before 11:30 a.m. on November 19, 2008, during the course of which Defendant made no complaint about any abdominal pain, nor did she appear to be in any pain or discomfort whatsoever. Furthermore, Defendant met with her attorney for nearly two hours later that afternoon, upon the conclusion of which neither she nor her attorney alerted the officers of any abdominal pain or discomfort. It was not until after 6:00 p.m. that Defendant first complained about abdominal pain. A medical treatment response immediately followed, and Defendant was transported to the hospital. Other than the fact that this episode occurred on the same day as the interview, there is no evidence of any relation between the two. The Court's analysis does not stop here, however.

Defendant argues that the officers failed to "scrupulously honor her request for counsel in violation of the Fifth Amendment." (Document No. 14) at ¶ 16. As the Supreme Court noted in *Miranda*, "the right to have counsel present at the interrogation is

13

indispensable to the protection of the Fifth Amendment privilege." 384 U.S. at 469, 86 S.Ct. 1602. In this context, however, it is important to note the legal distinction between the two *Miranda* rights, namely the right to remain silent and the right to have an attorney present. While the *Miranda* right to remain silent originates in the Fifth Amendment's prohibition on coerced confessions, the *Miranda* right to counsel during a custodial interrogation is "justified only by reference to its prophylactic purpose." *Davis v. U.S.*, 512 U.S. 452, 458, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994)(*quoting Connecticut v. Barrett*, 479 U.S. 523, 528, 107 S.Ct. 828, 832, 93 L.Ed.2d 920 (1987)). Recognizing the importance of the right to counsel for suspects in criminal investigations, the Supreme Court specifically extended the "special protection of the knowing and intelligent waiver standard" of the *Miranda* right to remain silent to the *Miranda* right to counsel. *Id.* (*quoting Edwards v. Arizona*, 451 U.S., at 483, 101 S.Ct., at 1884).

With its decision in *Edwards*, the Supreme Court held that law enforcement officers must immediately cease questioning a suspect who has clearly asserted his right to have counsel present during custodial interrogation. The rationale underlying this rule is that police must respect a suspect's wishes regarding his right to have an attorney present during custodial interrogation. At the same time, however, the Supreme Court balanced the importance of such wishes with "the other side of the *Miranda* equation", namely the need for effective law enforcement. *Davis*, 512 U.S., at 461. While courts ensure compliance with the *Miranda* requirements through the exclusionary rule, it is the individual officers who, in the course of conducting a criminal investigation, must decide whether or not they can question an individual. It is in light of these competing interests that in cases such as this one, where a suspect waives the right to remain silent and speaks with officers, anything less than a subsequent clear assertion not to answer any further questions without the presence of an attorney fails to invoke the *Miranda* right to counsel. While a suspect is not required to "speak with the discrimination of an Oxford don," the request to have counsel present must be

14

unambiguous.[5] *Id.* at 459, 114 S.Ct. 2350. This means that a suspect "must articulate [her] desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.* The question as to whether a suspect invoked the right to counsel is an objective inquiry to be made by the court in order to "determine whether the accused actually invoked" her right to counsel. *Id.*

In this case, Defendant did not unambiguously invoke her right to counsel until she concluded the interview at 11:25 a.m. At the outset of the interview, Defendant was asked the question on the rights' advisement form as to whether she would be willing to speak with the officers, in response to which she wrote "Briefly, then I want my attorney present for the rest of the interview." This is hardly an unambiguous or unequivocal assertion that Defendant wanted her attorney present at that point. Quite the contrary, this response itself indicates that Defendant fully comprehended her right to have an attorney present and her contemporaneous decision to proceed with the interview at that point unassisted. Likewise, despite the use of the term "briefly", this written response cannot be held to unequivocally connote any particular length of time to which Defendant agreed to speak before the officers were expected to know when her counsel should be summoned. Not only is the term "briefly" a relative and ambiguous one, in this particular context, Defendant was the person who controlled how long she was willing to respond to questions before asking to proceed no further without her counsel present. Just as she freely and voluntarily waived her right to remain silent after being so advised of her right to do so, Defendant freely and voluntarily waived her right to have counsel present at the start of the interview.

The moment approximately fifteen to twenty minutes into the interview when Defendant muttered something to herself about her attorney was not an unequivocal and unambiguous articulation of her desire to stop answering questions until counsel was present.

---

[5] The Court notes that the Supreme Court very recently reiterated the holding of *Davis* requiring a suspect to unambiguously invoke the *Miranda* right to counsel. *See Berghuis v. Thompkins*, --- S.Ct. ---, 2010 WL 2160784 (June 1, 2010).

15

To that end, the Court notes that Defendant's aside comment to the effect of, "I think I need my attorney" or "I think I want my attorney" was made while her face was covered by her hands in such a way as to be virtually inaudible, was not heard by the officer sitting closest to Defendant, and was immediately followed by Defendant's own explanation about her ownership of the firearm used to shoot Special Agent Hicks without any intervening questions by any of the officers. As the Supreme Court has held, a statement is either an unambiguous assertion of the right to counsel or it is not. *Davis*, 512 U.S., 459. If the statement fails to meet the requisite level of clarity, the officers asking questions are not required to stop. *Id.* At best, it can be said that at the start of the interview, Defendant clearly wanted to proceed with the interview without the presence of counsel, and at one point apparently pondered to herself whether to continue, only to immediately choose to do so without the presence of counsel, as demonstrated by the immediate continuation of explaining her version of what occurred to the officers. In the face of these actions by Defendant, the officers were not required to ask clarifying questions, nor were they required to cease questioning in the face of what was at most equivocal and, more importantly, temporary indecision by Defendant. *See Id.* at 460. Defendant did clearly and unambiguously invoke her right to have counsel present at the conclusion of the interview, the point at which the officers asked her once again if she was prepared to have her statement recorded. At this point, the questioning ceased, and Defendant's *Miranda* right to have counsel present was scrupulously honored.

## CONCLUSION

For the reasons hereinabove stated, the motion to suppress the statements made by Defendant on November 19, 2008, while detained at the Allegheny County Police Department, will be denied. An appropriate Order follows.

McVerry, J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | )<br>)<br>) **2:09-cr-05** |
| v. | )<br>) |
| **CHRISTINA MARIE KORBE,** | )<br>) |
| Defendant. | ) |

**ORDER OF COURT**

**AND NOW**, this 9th day of June, 2010, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED, ADJUDGED AND DECREED** that DEFENDANT'S MOTION TO SUPPRESS NOVEMBER 19, 2008 STATEMENT TO LAW ENFORCEMENT OFFICERS WHILE DETAINED AT THE ALLEGHENY COUNTY POLICE DEPARTMENT, (Document No.91), is **DENIED**.

BY THE COURT:

s/ Terrence F. McVerry
United States District Court Judge

cc: Caroline M. Roberto, Esquire
Email: croberto@choiceonemail.com

Jay T. McCamic, Esquire
Email: jtmccamic@mspmlaw.com

Troy Rivetti, AUSA
Email: Troy.Rivetti@usdoj.gov

Bruce J. Teitelbaum, AUSA
Email: Bruce.Teitelbaum@usdoj.gov

Donovan Cocas, AUSA
Email: Donovan.Cocas@usdoj.gov