# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | 2:09-cr-05 |
| v. ) | |
| ) | |
| CHRISTINA MARIE KORBE, ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER OF COURT

Pending now before the Court is DEFENDANT'S MOTION TO SUPPRESS NOVEMBER 19, 2008 STATEMENT TO LAW ENFORCEMENT OFFICERS WHILE DETAINED AT HER RESIDENCE (Document No. 92), and DEFENDANT'S MOTION TO SUPPRESS NOVEMBER 25, 2008 STATEMENT TO AGENT OF OFFICE OF CHILDREN, YOUTH AND FAMILIES WHILE IN ALLEGHENY COUNTY JAIL (Document No. 93). Also before the Court is the GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS NOVEMBER 19, 2008 STATEMENT TO LAW ENFORCEMENT OFFICERS WHILE DETAINED AT HER RESIDENCE (Document No. 160), and GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS NOVEMBER 25, 2008 STATEMENT TO AGENT OF OFFICE OF CHILDREN, YOUTH AND FAMILIES WHILE IN ALLEGHENY COUNTY JAIL (Document No. 161). On April 14, 2010, an evidentiary hearing was ordered to consider the motion, and the hearing was conducted on May 4, 2010. All parties were represented by counsel who presented and argued the issues skillfully and effectively. The motions are now ripe for disposition.

Prior to the evidentiary hearing, the Court was provided with an update by the Government with respect to the evidence challenged in the motion to suppress filed at docket entry number 92, namely the statements allegedly made by the accused while detained in her residence on November 19, 2008. This update was provided subsequent to the Government's brief in opposition to the motion itself, which is contained in the record at docket entry 160.

More particularly, the Government informed the Defendant and the Court that it did not intend to offer into evidence the subject of that motion in its case in chief.  The Government reiterated this position in open court on the record during the May 4, 2010 hearing, noting that the motion to suppress those statements was moot.  The Defendant agreed.  The Court concurs.  In light of the Government's stated intention not to introduce the evidence challenged by Document No. 92, the Court will acknowledge that the motion and the need for an evidentiary hearing regarding the motion is moot.

The Court turns to the motion to suppress filed at Document No 93.  Defendant moves to suppress the statements made by her to Ms. Joey Manual, a caseworker at the Allegheny County Office of Children, Youth and Families ("CYF"), because, as a "state actor", Ms. Manuel violated her rights under the Fifth Amendment, the Sixth Amendment, and the Fourteenth Amendment.  Based upon the testimony and evidence presented during the suppression hearing and applicable law, the Court issues the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Criminal Procedure 12(d).  For the reasons that follow, the Court will deny the Defendant's motion.

**FINDINGS OF FACT**

This criminal case arose out of the tragic shooting of FBI Special Agent Samuel Hicks on November 19, 2008.  On that date, Hicks and other law enforcement officers were attempting to execute an arrest warrant for Robert Ralph Korbe at the family home, which he shared with his wife, Christina Korbe ("Defendant") and their two young children.  Defendant's motion to suppress statements made in the Allegheny County Jail on November 25, 2008, involves statements made by the Defendant to Ms. Joey Manuel, a CYF intake caseworker.  Upon consideration of the evidence presented during the evidentiary hearing, the Court makes the following findings of fact:

1. Among other things, CYF is a child protection agency that is responsible for

ensuring the safety and well-being of children under the age of eighteen (18) in those cases that are reported to the agency.

2. Reports concerning the welfare of children are received by a call screening department within CYF, and the cases are then randomly assigned to a caseworker within the geographic region corresponding to the location of the children.

3. The identity of those who make reports to CYF regarding the welfare of children, referred to as a "reporting source", is kept confidential and not made known to the parents of the children.[1]

3. Ms. Joey Manuel has been employed with CYF as an intake caseworker for eleven (11) years.

4. As an intake caseworker, Ms. Manuel's responsibilities in reported cases generally involve taking steps to assess the safety and well-being of a child in a given living arrangement, including making visits to a home in order to assess the child's environment, meeting with care-givers and parents, and participating in juvenile court proceedings.

5. CYF intake caseworkers who meet with people in the course of making assessments are required to report to law enforcement any disclosures made to them about any criminal act or event that involves the safety and well being of children.

6. CYF intake caseworkers who meet with people in the course of making assessments are not required to report to law enforcement any disclosures of

---

[1] CYF may also receive a report from those with a legal obligation, such as teachers or medical treatment providers, to make reports concerning the safety and well-being of children. In contrast to a reporting source (a person who voluntarily makes a report with CYF), those with a legal obligation to do so are referred to as a "mandated source." The report involving Defendant's children did not originate from a mandated source.

3

criminal events or acts that do not implicate the safety and well being of children.

7. Several days prior to November 25, 2008, CYF apparently received a report which expressed concern over the living environment of Defendant's two young children.

8. At the time, Defendant's children were being cared for by Defendant's parents within the region covered by Ms. Manuel.

9. Ms. Manuel was assigned to the case of the Defendant's children.

10. Ms. Manuel visited the home of Defendant's parents in order to conduct an assessment prior to her November 25, 2008 meeting with Defendant at the Allegheny County Jail ("ACJ").

11. Ms. Manuel met with Defendant in the ACJ on November 25, 2008.

12. After entering the facility, Ms. Manuel was escorted to a visiting room on one of the upper floors of the jail, where she met with Defendant.

13. No corrections officer was present during the meeting, nor was Defendant in restraints during the meeting.

14. Both Defendant and Ms. Manuel were seated at the same round table during the meeting, with a chair between them.

15. After Defendant entered the visiting room, Ms. Manuel introduced herself and explained the purpose of her visit, which was to discuss the living arrangement of Defendant's two children.

16. More particularly, regarding the purpose of her visit and scope of what she was there to discuss, Ms. Manuel testified as such, "I made it clear to her that I was only there to discuss her children and their living environment, [and] not any of her pending charges or any of the incidents that had occurred."

17. Ms. Manuel asked Defendant if she was willing to discuss her children, to

which Defendant acknowledged that Ms. Manuel was there to discuss Defendant's children, and agreed to talk with her.

18. Given the circumstances regarding the interview, namely that Defendant was incarcerated, currently confined to the Jail, and facing charges, Ms. Manuel further advised Defendant of her rights using form OCYF201A, "Individual Rights", a form that CYF employees refer to as the Miranda form.

19. Specifically, Defendant was advised of the following rights:

    a. You have the right to remain silent.

    b. Anything you say can and will be used against you in a court of law.

    c. You have the right to talk to a lawyer and have him/her present with you while you are being questioned.

    d. If you cannot afford to hire a lawyer, one will be appointed you represent you free of charge before any questioning, if you wish.

    e. You can decide at any time to exercise these rights and not answer any questions or make any statement.

20. The Individual Rights form also included a waiver provision that specifically queried:

    a. Do you understand each of these rights I have explained to you?

    b. Having these rights in mind, do you wish to talk to us now?

21. Next to each of the respective questions contained in the waiver provision were two blank boxes corresponding to two alternative responses to each question, "Yes" or "No".

22. Ms. Manuel read the five rights and the two waiver questions to Defendant.

23. Defendant responded in writing to the two waiver questions by placing check marks in the two boxes corresponding to a "yes", or affirmative, response.

24. Both Defendant and Ms. Manuel signed the bottom of the form.

25. No juvenile proceedings had commenced against Defendant at the time of the November 25, 2008, meeting, nor was Defendant represented by counsel with respect to any child custody or child placement proceeding.

26. In cases in which caseworkers meet with parents represented by a criminal defense attorney, it is the policy of CYF not to contact the attorney unless the subject of the meeting was related to the criminal charges.

27. Ms. Manuel considered the subject of her meeting with Defendant to be unrelated to the criminal charges Defendant was facing at the time.

28. Upon completion of the Individual Rights form, Ms. Manuel once again reiterated to Defendant that she was there to discuss the children, more particularly explaining that CYF had received a report, and that Defendant's input was being sought regarding what she would like to see occur with respect to the children.

29. Ms. Manuel further explained to Defendant that she was there to obtain background information regarding the children, as well as information regarding their schooling and medical histories to be used by CYF in assessing the situation.

30. Before asking any questions, Ms. Manuel once again stressed that she wanted to avoid discussing any of the topics surrounding Defendant's pending criminal charges, and to "solely focus on the children, her husband, and the grandparents."

31. Defendant agreed to the limitations expressed by Ms. Manuel.

32. The first portion of the discussion between Ms. Manuel and Defendant, which lasted approximately ten (10) to fifteen (15) minutes, began with Ms. Manuel reading a copy of the report aloud to Defendant, and proceeded into a discussion of who Defendant surmised to be the source of the report and that

person's motivations for making such a report.

33. Next, the discussion progressed to the topic of who Defendant would choose to care for her children.

34. Defendant informed Ms. Manuel that at the time of her arrest, she and her husband had arranged for her parents, the children's maternal grandparents, to take temporary custody of the children.

35. Defendant intended for her children to remain with her parents.

36. Defendant and Ms. Manuel next discussed the general background of the children, focusing in particular on childcare related topics such as their schooling, medical care, and whether they had any special needs.

37. At one point, Defendant described her children as happy and well adjusted.

38. Ms. Manuel and Defendant next discussed basic background information regarding Defendant's marriage to Robert Korbe and their domestic situation.

39. In particular, the two discussed how long the Korbes lived at their current residence, how long they have been married, how long they have known each other, and whether they lived together at the time of her arrest.

40. In response, Defendant generally provided that she had known her husband since high school, and that she was a "stay at home" mother who assisted her husband with his businesses.

41. Ms. Manuel attempted to ascertain whether any financial support from Defendant, her husband, or from elsewhere was available to assist Defendant's parents in caring for the children.

42. Ms. Manuel asked Defendant about financial support for the children in order to determine how the children were going to be supported, and also because CYF offers financial aid for foster care in certain situations.

43. The discussion turned to the topic of Robert Korbe's businesses, at which

point, unprompted and not in response to a question, Defendant began to talk about the pending charges against her husband.

44. Defendant's comments were to the effect that she was "positive" that Robert Korbe was not involved in drug trafficking, and, further, that she would have known if he was because she maintained the records for her husband's businesses.

45. As Defendant was making these comments, Ms. Manuel reminded Defendant that the discussion was meant to focus on the Korbe children, and that Ms. Manuel did not want to discuss the pending charges against either Defendant or Robert Korbe.

46. Defendant responded to this reminder by noting that she was upset about the manner in which the Korbe family was being portrayed "on the news" and that she and her husband were not "those kind of people."

47. Ms. Manuel asked no questions beyond those about the businesses of Robert Korbe, which were asked within the context of possible financial support for the children as they were being cared for by their maternal grandparents.

48. Unprompted, not in response to any question asked by Ms. Manuel, and after the reminder not to discuss any topic involving the criminal charges pending against her and her husband, Defendant continued to discuss her arrest and the pending charges.

49. Defendant told Ms. Manuel that she never intended to shoot an FBI special agent, and further explained: 1) that their residence had been burglarized while the family was on vacation during August, 2008; 2) their house was in a very secluded location; 3) that she was always fearful of intruders; and 4) that she "felt bad" about what happened.

50. Ms. Manuel, once again, reminded Defendant that she was not there to discuss

the pending charges, and that the two of them should "stay away" from that subject.

51. Defendant responded that she wanted to discuss the events of November 19, 2008, because her children were in the house at the time.

52. To which, Ms. Manuel one final time warned Defendant not to discuss the subject of her arrest, yet Defendant continued to do so.

53. At that point, Ms. Manuel simply allowed Defendant to continue to talk.

54. Defendant began to cry as she explained to Ms. Manuel that she missed her children, and that she was upset with being away from them.

55. In an effort to reassure Defendant, Ms. Manuel noted that she had seen the children, that they appeared to be doing well, and that she was under the belief that they were not aware that their mother was incarcerated.

56. At that point, Defendant began to express anger and frustration as to the events of November 19, 2008.

57. Defendant made a number of comments to Ms. Manuel to the effect that:

   a. she was very upset that the police and the FBI had come to her home at 6:30 in the morning to execute a warrant for Robert Korbe's arrest;

   b. the FBI acted recklessly;

   c. "they" knew there were children in the home;

   d. Robert Korbe apparently had some sort of hearing the following day where he could have been served with the warrant for his arrest; and

   e. "this never would have happened" and "that FBI agent would not have been killed, as the police acknowledged, [if] the FBI [had] not acted recklessly."[2]

---

[2] The quotation is taken from Ms. Manuel's testimony during the evidentiary hearing. Ms. Manuel's testimony on these points quoted Defendant's comments to her on November 25, 2008.

9

58. Defendant made one final point that she believed that her husband would be released following his preliminary hearing which she expected to occur within a couple of weeks.

59. At this point, Ms. Manuel terminated her conversation with Defendant.

60. In sum, Ms. Manuel met with Defendant on November 25, 2008, at the ACJ in order to discuss the safety and well being of her children.

61. At the outset of the conversation with Defendant, Ms. Manuel specifically requested that Defendan The quotation is taken from Ms. Manuel's testimony during the evidentiary hearing. Ms. Manuel's testimony on these points quoted Defendant's comments to her on November 25, 2008. t not discuss the events of November 19, 2008, which was the date in which FBI Special Agent Samuel Hicks was shot and killed in the Korbe residence.

62. One of the reasons for the desire not to discuss what occurred on November 19, 2008, was that such information was beyond the primary purpose for Ms. Manuel's visit, which was to assess the condition of Defendant's family regarding the immediate safety and well-being of the children in their grandparents' care.

63. A second reason for Ms. Manuel's stated intention of avoiding any discussion of the events of November 19, 2008, was the desire to avoid being drawn into subsequent criminal proceedings involving the parent.

64. As a result of her meeting with Defendant, Ms. Manuel made an assessment of the children's situation and a recommendation as to where the children should reside.

65. Based upon the information contained within Ms. Manuel's assessment, and working in conjunction with the children's school, CYF determined that it was appropriate for the children to remain with their maternal grandparents.

66. Following her meeting with Defendant, Ms. Manuel did not notify or volunteer to share any information from that meeting with any law enforcement personnel.

67. It was not until several months later that Ms. Manuel was contacted by some person or agency (not identified) regarding her meeting with Defendant.

## CONCLUSIONS OF LAW

Defendant contends that her Fifth and Sixth Amendment rights were violated when Ms. Manuel subjected her to questioning without either the presence of her attorney or providing notice to her attorney. Document No. 93. In response, the Government argues that Ms. Manuel was not a "state actor", and further that the meeting between Ms. Manuel and Defendant was not a custodial interrogation. Document No. 161. As noted herein, the evidence adduced at the hearing established that Ms. Manuel clearly introduced herself to Defendant at the start of the interview, that Defendant was informed that the discussion was to involve the living arrangements of her children and that it would not entail information related to Defendant's pending criminal charges. Defendant was immediately advised of her Fifth Amendment rights consistent with the Supreme Court decision in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602 (1966), and further told that she did not have to talk with Ms. Manuel. Defendant knowingly waived those rights and agreed to speak to her.[3]

In order to better understand the issue of whether Ms. Manuel's meeting with Defendant was a custodial interrogation, it is necessary to review the legal basis upon which

---

[3] The Supreme Court has yet to dictate the precise language for the four warnings required under the *Miranda* decision. *See, e.g., Florida v. Powell*, --- U.S. ---, 130 S.Ct. 1195, 1204 (Feb. 23, 2010). An advisement of rights is sufficient if a person is warned:1) that she has the right to remain silent; 2) that anything she says can be used against her in a court of law; 3) that she has the right to the presence of an attorney; and 4) that if she cannot afford an attorney, one will be appointed prior to the questioning if desired. *Id* (citations omitted). The Individual Rights form used by CYF satisfies the warning requirement of *Miranda*.

11

she met with Defendant on November 25, 2008. The Child Protective Services Law ("CPSL"), 23 Pa.C.S.A. §§ 6301, *et seq.,* requires that each county children and youth social service agency provide child protective services, and for the county agency to serve as the sole civil agency responsible for receiving and investigating all reports of child abuse. 23 Pa.C.S.A. §§ 6361 & 6362. As part of that responsibility, the CPSL also mandates reporting procedures in cases of suspected child abuse. "Mandated sources" are those individuals who, in the course of their employment or position, come into contact with children and are required to report to the child protective service agency in cases in which they have a reasonable cause to suspect that a child is or has been abused. *Id.* at §§ 6311 & 6313. In cases in which a report is received from a mandated source, county agencies serve not only as treatment agencies, but also as the investigative arm of the statewide system of child protective services. *Id.* at § 6368.

Beyond providing child protective services in cases of suspected child abuse, county children and youth social services agencies are required under the CPSL to provide services in non-abuse situations that may happen to involve the safety and well-being of children. These general protective services include, but are not limited to, offering benefits such as training in parenting skills, counseling services, and written family service plans. 23 Pa.C.S.A. §§ 6373 and 6375. County agencies also assist children and families to obtain benefits for which they may qualify under federal, state, and local regulations. *Id.* Similar to the intake of suspected cases of abuse, intake for these non-abuse situations occurs when a report or referral is made to the agency, either from a mandated source or from a person who voluntarily chooses to make a report regarding the safety and well-being of children. *Id.* at §§ 6312 and 6375(a). The assessment procedure for non-abuse cases differs from that of cases with suspected abuse. *Id.* at § 6375(c).

As noted herein, Defendant seeks to suppress all statements made by her in the meeting with Ms. Manuel on the basis that the statements violated her rights under the Fifth

12

and Sixth Amendments of the U.S. Constitution. In *Miranda*, the Supreme Court established a conclusive presumption that all confessions or admissions made during a period of custodial interrogation are, intrinsically, compelled in violation of the Fifth Amendment's privilege against self-incrimination. *Miranda*, at 467, 865 S.Ct. At 1624. *See also, Oregon v. Elstad*, 470 U.S. 298, 310, 105 S.Ct. 1285, 1300 (1985). The threshold requirements necessitating *Miranda* warnings are custodial interrogation and government involvement. Similarly, an accused's Sixth Amendment rights are violated when her own incriminating words are used against her after being "deliberately elicted" from her following the initiation of adverse judicial proceedings. *See Massiah v. United States*, 377 U.S. 201, 206, 84 S.Ct. 1199, 1203, 12 L.Ed.2d 246 (1964). For Sixth Amendment purposes, the question becomes, did Ms. Manuel, while serving as a government agent, deliberately elicit incriminating statements from Defendant.

For the ease of structure of the analysis, the Court will address both the Fifth Amendment challenge and the Sixth Amendment challenge *seriatim*. The Court's initial inquiry is whether Defendant was subjected to a custodial interrogation which required procedural safeguards for the rights protected by the Fifth Amendment. While there is no question that Defendant was "in custody" at the time of the meeting with Ms. Manuel on November 25, 2008, the question is whether this meeting can be considered a custodial interrogation for the purpose of invoking the Fifth Amendment privilege. The Court holds that it was not.

With the decision in *Miranda*, the United States Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id.* at 444, 86 S.Ct. 1602. Furthermore, this "Fifth Amendment privilege is available outside of criminal court proceedings and serves to protect persons in all settings in which their freedom of action is

curtailed in any significant way from being compelled to incriminate themselves." *Id.*, 384 U.S. at 467, 86 S.Ct. 1602. Accordingly, an individual in custody must receive certain warnings before any official interrogation, including warnings that he/she has a "right to remain silent" and that "anything said can and will be used against the individual in court." *Id.* at 467-69, 86 S.Ct. 1602; *see also Estelle v. Smith*, 451 U.S. 454, 466-67, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981).

The Fifth Amendment right to remain silent cannot be invoked, however, unless it is established that Defendant was subject to interrogation. *See Miranda*, 384 U.S. at 444, 86 S.Ct. 1602. As the Supreme Court held in *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), this rule comes

> into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or action on the part of police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

*Id.* at 300-01, 100 S.Ct. 1682 (internal footnotes omitted). An incriminating response is "any response - whether inculpatory or exculpatory - that the prosecution may seek to introduce at trial." *Id.* at 301 n. 5, 100 S.Ct. 1682 (emphasis in original). The Supreme Court's use of terminology such as "interrogation", "questioning", and "response" within this context is not without significance. As the Supreme Court held, police may not "be held accountable for the unforeseeable results of their words or actions", *id.* at 302, 100 S.Ct. 1682, and "to constitute an interrogation their conduct 'must reflect a measure of compulsion above and beyond that inherent in custody itself.'" *Id.* at 300, 100 S.Ct. 1682.

Given this precedent, inherent in any determination of whether an interaction between an interviewer and a criminal suspect is an interrogation is the necessary intention by said interviewer to obtain or otherwise receive a response that may be introduced at trial by the prosecution. It takes more than an unrelated verbal interaction between a government employee and an accused to become an interrogation, and likewise, it takes more than a

14

spontaneous insertion of either inculpatory or exculpatory statements by an accused into an exchange to recast an unrelated conversation into an interrogation. To hold otherwise would require an advisement of rights in every routine exchange an accused would have, particularly an accused who is incarcerated prior to trial. The basic format of a discussion, even one in the form of questions and answers, between an accused by a government employee is not what controls, it is the content of the discussion and the manner in which the content is derived that does.

Where, as here, a government employee communicates with an accused, explains the purpose of the discussion with the accused, expressly outlines the parameters of exchange at the start to exclude discussion that may lead to a response related to pending criminal charges, asks no questions that reasonably would have elicited such a response, and upon hearing unprompted and spontaneous comments regarding the criminal charges, terminates the meeting, there is no custodial interrogation. The requisite intent by a state actor at the heart of the protection guaranteed by the Fifth Amendment is not only lacking in this case, but the evidence establishes the opposite, that the CYF intake caseworker intended to avoid any discussion that may have produced a response that could be introduced at trial. As such, the Court finds that the subject conversation was not a custodial interrogation.

The Court notes that the fact that Defendant was advised of her rights at the start of the discussion in this particular situation does not necessarily amount to the meeting becoming a custodial interrogation, nor does it reflect an intention on the part of Ms. Manuel to elicit information that may be used in the prosecution of Defendant in light of the totality of the circumstances. When she met with the Defendant, Ms. Manuel was not the equivalent of law enforcement, and therefore, the meeting was not a custodial interrogation. *Cf. Commonwealth v. Heggins*, 809 A.2d 908, 914 (Pa.Super. 2002). More particularly, this was not a situation in which there was a reasonable suspicion of child abuse, nor was Ms. Manuel's assessment initiated as a result of a legally mandated report. In the course of

completing her assessment, Ms. Manuel did not discover any information that caused her to suspect that child abuse had occurred. This is significant because if Ms. Manuel did discover such information, she would have been subject to the mandatory reporting provisions of the CPSL. 23 Pa.C.S.A. § 6336. As such, the investigative function and responsibilities of Ms. Manuel's position as a CYF caseworker were in no way involved or implicated with this meeting. Defendant was advised of her rights as a matter of course given the fact she was incarcerated. According to Ms. Manuel, CYF caseworkers routinely have incarcerated parents sign the Individual Rights form at the start of interviews.

The Court notes that even if it was a custodial interrogation, which it was not, the procedural safeguards required to protect Defendant's right against self-incrimination were satisfied and there was no violation of Defendant's rights under the Fifth Amendment. She was advised of her rights both orally and in writing. She acknowledged that she understood her rights, waived them, and agreed to speak with Ms. Manuel, during which she volunteered information that was nonresponsive to specific questions posed by Ms. Manuel.

Likewise, there was no violation of Defendant's rights under the Sixth Amendment. Defendant argues that "the caseworkers's questioning of Mrs. Krobe violated her Sixth Amendment right to have counsel present after the initiation of charges." Document No. 93 at ¶ 15. There is no dispute that criminal charges had been initiated against Defendant, that she had been arraigned on a charge of criminal homicide for the death of Special Agent Hicks on November 19, 2008, and that she had counsel prior to November 25, 2008.

The Court finds that there was no violation of Defendant's Sixth Amendment rights. To that end, the Court draws two conclusions. First, Ms. Manuel was not acting under any instructions from law enforcement to obtain information, nor did she attempt to obtain incriminating information from Defendant. As the record showed, she expressly attempted to avoid doing so. The record further demonstrates that Ms. Manuel did not contact law enforcement following the conclusion of her meeting, but that she was contacted by law

enforcement several months later. Second, Ms. Manuel identified herself to the Defendant at the start of the interview, explained the purpose of her visit, and further explained that she did not want to discuss the occurrences of November 19, 2008. Taken together, Ms. Manuel did nothing to deliberately elicit, either directly or indirectly, incriminating statements from Defendant.

## CONCLUSION

For the reasons hereinabove set forth, the motion to suppress the statements made by Defendant on November 25, 2008, to Ms. Joey Manuel, an intake caseworker for the Allegheny County Office of Children, Youth and Families (Document No. 93), will be denied.

Furthermore, the motion to suppress the statements made by Defendant to law enforcement officers while in the basement of her residence on November 19, 2008 (Document No. 92), will be dismissed as moot. An appropriate Order follows.

McVerry, J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| ) | **2:09-cr-05** |
| **v.** ) | |
| ) | |
| **CHRISTINA MARIE KORBE,** ) | |
| ) | |
| **Defendant.** ) | |

## ORDER OF COURT

**AND NOW**, this 9th day of June, 2010, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED, ADJUDGED AND DECREED** that DEFENDANT'S MOTION TO SUPPRESS NOVEMBER 25, 2008 STATEMENT TO AGENT OF OFFICE OF CHILDREN, YOUTH AND FAMILIES WHILE IN ALLEGHENY COUNTY JAIL (Document No. 93) is **DENIED**.

It is further **ORDERED**, that, DEFENDANT'S MOTION TO SUPPRESS NOVEMBER 19, 2008 STATEMENT TO LAW ENFORCEMENT OFFICERS WHILE DETAINED AT HER RESIDENCE (Document No. 92) is **DISMISSED** as moot.

BY THE COURT:

s/ Terrence F. McVerry
United States District Court Judge

cc:  Caroline M. Roberto, Esquire
Email: croberto@choiceonemail.com

Jay T. McCamic, Esquire
Email: jtmccamic@mspmlaw.com

Troy Rivetti, AUSA
Email: Troy.Rivetti@usdoj.gov

Bruce J. Teitelbaum, AUSA
Email: Bruce.Teitelbaum@usdoj.gov

Donovan Cocas, AUSA
Email: Donovan.Cocas@usdoj.gov