**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | **2:09-cr-05** |
| | ) | |
| CHRISTINA MARIE KORBE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Pending now before the Court is DEFENDANT'S MOTION TO SUPPRESS TAPE RECORDED TELEPHONE CONVERSATIONS FROM THE ALLEGHENY COUNTY JAIL AND THE CAMBRIA COUNTY PRISON (Doc. No. 90), the government's brief in opposition to the motion (filed at Doc. No. 158), Defendant's reply to the government's response (Doc. No. 184), and the Government's sur-response to Defendant's reply (Doc. No. 190). On May 25, 2010, an evidentiary hearing was ordered to consider the motion, and the hearing was conducted on June 7, 2010. All parties were represented by counsel who presented and argued the issues skillfully and effectively. At the conclusion of the hearing, the Court granted Defendant's request to file a supplemental brief in support of her motion. Defendant filed her supplemental brief on June 23, 2010 (Doc. No. 213), to which the government responded on June 28, 2010 (Doc. No. 217). Also pending before the Court is DEFENDANT'S MOTION FOR IDENTIFICATION OF JAIL CALLS (Doc. No. 104), and the government's response thereto (Doc. No. 163). The motions are ripe for disposition.

Defendant moves to suppress the statements which she made in recorded telephone conversations while incarcerated because, as she avers, the statements were obtained in violation of her rights under the Due Process Clause of the Fourteenth Amendment, her rights against self-incrimination and to testify on her own behalf under the Fifth Amendment, her right to counsel under the Sixth Amendment, and her rights to be free from unlawful searches and seizures under the Fourth Amendment. Based upon the testimony and evidence presented during the suppression hearing and applicable law, the Court issues the following Findings of Fact and

Conclusions of Law pursuant to Federal Rule of Criminal Procedure 12(d). For the reasons that follow, the Court will deny Defendant's motions.

## FINDINGS OF FACT

This criminal case arose out of the tragic shooting of FBI Special Agent Samuel Hicks on November 19, 2008. On that date, Hicks and other law enforcement officers were attempting to execute an arrest warrant for Robert Ralph Korbe at the Korbe residence, 111 Woods Run Road, Indiana Township, Pennsylvania, which he shared with his wife, Christina Korbe ("Defendant") and their two young children. The Court makes the following findings of fact:

1.  On November 19, 2008, Defendant was arrested and incarcerated at the Allegheny County Jail ("ACJ"). On or about December 20, 2008, Defendant was transferred to the Cambria County Prison ("CCP") in Ebensburg, Pennsylvania.

2.  Captain Thomas Leicht is employed by the Allegheny Count Bureau of Corrections and serves as the Director of Internal Affairs at the ACJ. He testified about the operation of the inmate telephone system at the jail. *Inter alia*, Captain Leicht maintains the ACJ's internal monitoring and recording system and serves as a liaison to outside agencies which may seek tapes of inmates' outgoing calls. His uncontradicted testimony establishes the following facts.

3.  The ACJ provides telephones for the use of inmates. The telephones are located in the common areas of each housing pod within the jail.[1]

4.  There are no incoming calls. All calls are outgoing collect calls and all calls are recorded unless an inmate affirmatively demonstrates that the subject matter of the call will be confidential, *e.g.*, a conversation with an attorney.

5.  Recordings of the calls are maintained in a digital format on a computer hard drive for approximately one year, at which time the calls are recorded over. Once

---

[1]  While not germane to Defendant's motion, the male disciplinary housing unit within the ACJ is the only exception to this rule. There are no phones in that unit for use by inmates.

2

this occurs, the calls are lost unless prior to being recorded over, the calls are downloaded and preserved on separate storage media such as a computer compact disk.

6.      Inmates are provided with considerable notice that their outgoing calls will be recorded.

7.      The ACJ has an orientation program for newly arrived residents, typically provided within the first forty-eight (48) hours of an inmate's arrival into the jail. The orientation consists of a video presentation in which the procedures within the jail are explained, including the inmate handbook, what is expected of inmates, and the use of the inmate telephone system.

8.      The Allegheny County Inmate Handbook, which each inmate is specifically advised to read and understand, is prominently displayed in each housing pod of the jail, and it also explains the use of the inmate telephone system. The handbook, updated February 2001, was admitted into evidence as Government Exhibit 1 ("GE 1").

9.      Chapter 5 of the handbook is entitled "Outside Communication" and explains the following rules for the use of telephones by inmates:

        a.      A bank of telephones is provided for the use of inmates in the Day Room area (a common area within each housing unit);

        b.      Only collect calls may be made from these phones; and,

        c.      The inmate phone system "automatically monitors all outgoing calls from the housing units."

10.     The ACJ is an institution accredited through American Correctional Association ("ACA"). On January 15, 2008, the ACJ issued Policy # 62, "Inmate Phone System/Attorney Calls/Intake Phone Card", consistent with ACA standards.

11.     Policy # 62 sets forth, *inter alia*, the following procedural guidelines:

A.    "All inmate phone calls must be collect calls";

B.    "All inmate phone calls will be recorded, pursuant to the Wiretapping and Electronic Surveillance Act, 18 Pa.C. 5.5701"[2];

C.    Attorney phone calls will not be recorded when procedural guidelines are followed."

A copy of Policy # 62 was admitted into evidence as GE 3. Copies of Policy # 62 are available in each housing unit for review by inmates and staff.

12.    Policy # 62 also notes that "Inmate telephone calls are a privilege, which may be curtailed or rescinded for administrative or disciplinary reasons".

13.    Placards are conspicuously posted upon each telephone which state, "ALL CALLS ARE RECORDED."

14.    As explained in both the Inmate Handbook and Policy # 62, the only exception to the policy of monitoring and recording of inmate phone calls are those calls between inmates and their attorneys.

15.    To assure that the attorney/client privilege is not violated, the inmate phone system recognizes whether the inmate has dialed an attorney's office phone number, and if so, the phone call is neither monitored nor recorded.[3]

16.    Additionally, a message which advises that the call will be recorded is heard prior to, and at periodic intervals throughout, each outgoing call. The recipient of the

---

[2]    The statutory citation for Pennsylvania's Wiretapping and Electronic Surveillance Act, the statute identified by short title in the policy, is 18 Pa.C.S.A. § 5701, *et seq*. The fact that a numeral five apparently replaces both the single letter abbreviation the word "statute" and the typographical symbol used to connate the word "section" does not impact the Court's decision for the reasons stated *infra*.

[3]    As part of this procedure, attorneys are required to provide an office number to the ACJ that is not a cell phone number, and a copy of the attorney's license to practice law. Once the ACJ confirms the information, the attorney's office phone number is entered into the system under a condition in which that number is automatically recognized and the calls are neither recorded nor monitored.

collect call from the jail must hear the message before accepting the call.

17. Defendant was aware that the non-attorney phone calls she made from the ACJ were being monitored by the FBI.

18. During the evidentiary hearing, the United States introduced a transcript at GE 11 of a phone call made by Defendant from the ACJ on November 23, 2008, in which she explicitly stated, "There's somebody — they're listening to every call I make. ... The, the FBI. The FBI's listening to every [obscenity] word I say."

19. The telephone system enables the jail's staff to contemporaneously listen to inmates' telephone conversations. However, this capability is not utilized by the Internal Affairs staff as a matter of course, in light of the tremendous volume of telephone calls that are made daily.

20. Circumstances in which calls may be monitored by staff include those situations involving calls being made from inmates who have been identified by an outside law enforcement agency as potentially involved in criminal behavior, and also those situations involving high profile inmates charged with homicide.

21. In general, the safety and security of the ACJ are the purposes for recording inmates' telephone calls. Examples of safety and security issues considered of primary importance to the Internal Affairs Office include such topics as escape, violence toward other inmates, violence toward staff, improper interaction between staff and inmates, the introduction and presence of contraband, and improper interaction between inmates (such as gang-related activities).

22. The concerns regarding the safety and security of the ACJ are more attenuated in those situations involving inmates suspected of engaging in criminal activity while incarcerated and with high profile inmates charged with homicide.

23. Defendant's placement in the ACJ was significant to Captain Leicht for two reasons: 1) he considered Defendant to be a high profile inmate in light of the

crime with which she had been charged, and 2) in light of the fact that her husband was also incarcerated in the ACJ at the time, extra measures were required in order to maintain separation between the two.

24.    Accordingly, Captain Leicht began monitoring Defendant's calls from the beginning of her incarceration. During those phone calls, Captain Leicht discovered that Defendant was communicating with her incarcerated husband. Captain Leicht also overheard threatening comments made by Defendant directed to people outside of the ACJ.

25.    During the period of Defendant's incarceration at ACJ, she placed approximately one hundred and forty three (143) phone calls, all of which were recorded.

26.    Upon Defendant's arrival in the ACJ, the Internal Security Office began receiving requests from various law enforcement agencies, including the Allegheny County District Attorney's Office and the FBI, for access to the recordings of her phone conversations.

27.    Those initial requests were typically followed with a formal request by way of subpoena. In response to those requests, Captain Leicht provided recordings of Defendant's phone conversations to law enforcement.

28.    The content of a phone call placed by Defendant on December 10, 2008, was considered as evidence in Defendant's detention hearing conducted before a United States Magistrate Judge on December 15, 2008.

29.    Captain Richard Sobecky is employed at the CCP as a shift supervisor, and testified about the operation of their inmate telephone system. *Inter alia*, Captain Sobecky maintains the CCP's internal monitoring and recording system and serves as a liaison to outside agencies which may seek tapes of inmates' outgoing calls. His uncontradicted testimony establishes the following facts.

30.    The CCP provides telephones for the use of inmates. The telephones are located

in the common areas of each housing unit within the jail.

31.   All outgoing calls are collect and automatically recorded unless the phone number being dialed by the inmate is identified as belonging to an attorney, in which case the calls are not recorded.

32.   Recordings of the calls are maintained in a digital format for three years, at which time, unless saved in another storage medium, the data is purged from the system.

33.   Inmates are provided with considerable notice that their outgoing calls will be recorded.

34.   The CCP has an orientation program for newly arrived residents that consists of a video presentation which explains the procedures within the Prison, including, *inter alia*, the inmate handbook, and the inmate's rights, responsibilities, and various prison procedures.

35.   The Cambria County Prison Inmate Handbook, which each inmate is specifically advised to read and understand, is prominently displayed in each housing pod of the jail, and explains the use of the telephones by inmates.  The Cambria County Prison Inmate Handbook was revised in July 2008, a copy of which was admitted into evidence as GE 5.[4]

36.   Section IV of the handbook is entitled "General Rules/Information" and explains, *inter alia*, "All Telephone calls made on the inmate telephones, with the exception of attorney calls, are monitored and recorded."

37.   On December 22, 2008, Defendant attended CCP's orientation program and received a copy of the CCP Inmate Handbook.  On that day, Defendant signed a written acknowledgment that she attended the program, watched the orientation

---

[4]   The Cambria County Prison Inmate Handbook was subsequently revised in March 2010, a copy of which was admitted into evidence during the hearing as GE 6. There is no difference in the content between the two editions of the Handbook germane to Defendant's motion.

video, and received a copy of the Inmate Handbook.

38. Defendant signed the following written acknowledgment:

"I, the undersigned have received a copy of the Cambria County Prison Inmate Handbook. I understand that I am responsible for reading the entire handbook and for following prison procedures, rules, and policies that it describes. I understand that I am able to ask staff questions concerning the handbook."

A copy of the written acknowledgment was admitted into evidence as GE 7.

39. In addition to being provided with a copy of the handbook, in each housing unit, the Inmate Handbook is posted.

40. Further, signs are posted on the walls next to the inmate phones in CCP that read, "PHONE CALLS ARE MONITORED AND RECORDED." Photographs of such signs were admitted into evidence as GE 10 and 11.

41. Similar to the inmate phone system at the ACJ, a message advising that the call will be recorded is heard at the start of each outgoing call. The recipient of the collect call from the jail must hear the message before accepting the call.

42. The telephone system allows the CCP's staff to contemporaneously listen to inmates' telephone calls.

43. In general, the institutional safety and security of the CCP are the purposes for recording inmates' telephone calls. Examples of safety and security issues include such topics as escape, violence toward other inmates, violence toward staff, improper interaction between staff and inmates, the introduction and presence of contraband, and improper interaction between inmates (such as gang-related activities).

44. Upon Defendant's arrival at the CCP, Captain Sobecky began receiving requests from law enforcement officials for access to the recordings of her phone conversations.

45. Upon receiving a request from the FBI, Captain Sobekcy enabled live monitoring from a remote location of Defendant's phone calls, monitoring which began upon

8

Defendant's arrival and continued for several months.[5]

## CONCLUSIONS OF LAW

In her motion to suppress, Defendant avers violations of her constitutional rights as protected under the First, Fourth, Fifth and Sixth Amendments, and the Due Process Clause of the Fourteenth Amendment. More particularly, Defendant avers the following:

1)    First Amendment violation: Defendant argues that the government's use of phone call recordings that included her "criticism of the criminal charges" unconstitutionally chilled her exercise of freedom of speech. Doc. No. 90 at pp. 7 & 8.

2)    Fourth Amendment violation: Defendant argues that the violation of two statutes (one federal and one Pennsylvania), namely 18 U.S.C. § 2511(2)(c) and 18 Pa.C.S.A. § 5703, constitute violations of her right to be free from unreasonable searches and seizures. Doc. Nos. 90 at p. 7, and 213 at § A.

3)    Fifth Amendment violation (self incrimination and right to testify): Defendant argues that her rights to be free from self-incrimination are violated when the government "passively compel[s] confessions by exposing suspects to the 'inherently coercive' environments created by custody", and that "wholesale, unlimited, extra judicial eavesdropping afforded the government by unfettered access to all of the tape recorded calls" interferes with her right to testify on her

---

[5]    On or about February 5, 2009, Defendant provided the name and telephone number of her attorney (at the time) to her inmate counselor in order for the calls she subsequently placed to that phone number to be identified as confidential and not to be recorded. For some unknown reason, a call on June 18, 2009 to her attorney's number was not identified by the phone system as an attorney call and, as a result, was recorded and subsequently monitored by an FBI special agent. Upon discovery of this inadvertent monitoring of what should have been a confidential call, the FBI ceased monitoring from a remote location. The Court further notes that counsel for the United States has assured the Court that no prosecuting attorney has heard the recording, and Defendant's current counsel is satisfied that is the case.

own behalf.  Doc. No. 90 at pp. 6 - 7.

4)      Fifth and Fourteenth Amendments (due process): Relying upon *Wardius v.*
        *Oregon*, 412 U.S.470, 93 S.Ct. 2208 (1973), Defendant argues that the
        government's access to and use of her recorded telephone calls deprives her of
        due process because it affords the prosecutor "extraordinary discovery" without a
        mechanism for Defendant's reciprocal discovery.  *Id.* at pp. 3 - 4.

5)      Sixth Amendment (right to counsel): Defendant argues that her right to counsel
        was violated when the government obtained evidence through the interception of
        her phone calls outside of the presence of her counsel after the initiation of formal
        charges.  *Id.* at 5 - 6.

In response, the United States challenges each argument, and opposes the suppression.
The Court will address each argument *seriatim*.

As a threshold matter, the Court begins its analysis with the setting in which the alleged
violations of Defendant's rights occurred, specifically the ACJ and the CCP.  The Supreme Court
has recognized the diminished rights of those in and visiting prisons.  *See Hudson v. Plamer*, 468
U.S. 517, 526 (1984)("the recognition of privacy rights for prisoners in their individual cells
simply cannot be reconciled with the concept of incarceration and the needs and objectives of
penal institutions.")  Additionally, "it is obvious that a jail shares none of the attributes of privacy
of a home, an automobile, an office, or a hotel room.  In prison, official surveillance has
traditionally been the order of the day." *Lanza v. State of N.Y.*, 370 U.S. 139, 143 (1962); *see*
*also Hunter v. Auger*, 672 F.2d 668, 674 (8th Cir. 1982)(same).  Further, the Supreme Court has
specifically held:

> Lawful incarceration brings about the necessary withdrawal or limitation of many
> privileges and rights, a retraction justified by the considerations underlying our penal
> system. ... A detainee simply does not possess the full range of freedoms of an
> unincarcerated individual.
>
> ... [M]aintaining institutional security and preserving internal order and
> discipline are essential goals that may require limitation or retraction of the retained
> constitutional rights of both convicted prisoners and pretrial detainees. [C]entral to

10

all other corrections goals is the institutional consideration of internal security within the corrections facilities.

*Bell v. Wolfish*, 441 U.S. 520, 545-46, 99 S.Ct. 1861, 1877-78 (1979)(citations and internal quotations omitted); *accord Pell v. Procunier*, 417 U.S. 817, 822 (1974)("[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.") It is within these circumstances that Defendant's claims will be considered.

## A.     Defendant's rights under the First Amendment have not been violated

Defendant argues that a procedure by which phone calls are systematically recorded and provided to prosecutors for use unconstitutionally interferes with her exercise of the freedom of speech. In response, the United States notes that Defendant has the ability to meet with visitors at the jail in settings that are neither monitored nor recorded, and therefore, she has suffered no unconstitutional deprivation of her First Amendment rights. Furthermore, and fatal to Defendant's position, the United States correctly notes that the exclusionary rule has been limited to violations of the Fourth, Fifth and Sixth Amendments, *see* 38 Geo. L.J. Ann. Rev. Crim. Proc. 201 ("The Exclusionary Rule"), and that the Supreme Court has explicitly cautioned against any unwarranted expansion of the exclusionary rule. *United States v. Leon*, 468 U.S. 897, 907-08 (1984). The Court is unwilling to deviate from such authority here. For this reason, Defendant's motion to suppress on the basis of an alleged violations of her rights under the First Amendment will be denied.

## B.     Defendant's rights under the Fourth Amendment have not been violated

The Fourth Amendment of the United States Constitution protects individuals from "unreasonable searches and seizures." U.S. Const. amend. IV. "Since *Katz v. United States*, 389 U.S. 347 (1967), the touchstone of [Fourth] Amendment analysis has been the question whether a person has a constitutionally protected reasonable expectation of privacy. The [Fourth] Amendment does not protect the merely subjective expectation of privacy, but only those expectations that society is prepared to recognize as reasonable." *Oliver v. United States*, 466

U.S. 170, 177 (1984)(citations, quotation marks and brackets omitted).

To that end, the United States Court of Appeals for the Third Circuit has provided the following guidance:

> The fundamental task of any Fourth Amendment analysis is assessing the reasonableness of the government search. If the search is reasonable, there is no constitutional problem, for the Fourth Amendment only protects individuals from unreasonable searches and seizures. Determining whether a search is reasonable depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself, and involves balancing on the one hand, the degree to which [the search] intrudes upon an individual's privacy and, on the other hand, the degree to which [the search] is needed for the promotion of legitimate government interests.

*United States v. Sczubelek*, 402 F.3d 175, 182 (3d Cir. 2005)(citations and quotation marks omitted). On a motion to suppress, the government bears the burden of showing that each individual act constituting a search or seizure under the Fourth Amendment was reasonable. *United States v. Ritter*, 416 F.3d 256, 261 (3d Cir. 2005).

In her supplemental brief, Defendant contends that the recorded phone calls must be suppressed because the recordings were not made in conformity with the applicable state statute, 18 Pa.C.S.A. § 5704(14)(iv). In essence, Defendant reasons that Pennsylvania law requires inmate telephone calls be recorded only in accordance with the Pennsylvania Wiretapping Act (which requires notification to inmates that "their telephone conversations may be intercepted, recorded, monitored or divulged") and that Defendant was never expressly notified that any phone calls would be "divulged." In response, the United States cites a host of well established authority that flatly rejects the notion that a violation of a state law, or the existence of statutory protections, has any probative value in a federal court's analysis of a constitutional violation. Doc. No. 217 (*citing Virginia v. Moore*, --- U.S. ----, 128 S.Ct. 1598, 170 L.Ed.2d 559 (2008) (violation of state law is not determinative of whether evidence must be suppressed for Fourth Amendment violation); *California v. Greenwood*, 486 U.S. 35, 43-44 (1988)("We have never intimated ... that whether or not a search is reasonable within the meaning of the Fourth Amendment depends on the law of the particular State in which the search occurs. ...

Respondent's argument is no less than a suggestion that concepts of privacy under the laws of each state are to determine the reach of the Fourth Amendment. We do not accept this submission."); *cf City of Ontario v. Quon*, --- S.Ct. ---, 2010 WL 2400087 (June 17, 2010)([E]ven if the Court of Appeals was correct to conclude that the [Stored Communications Act] forbade Arch Wireless from turning over the transcripts, it does not follow that the petitioners' actions were unreasonable. Respondents point to no authority for the proposition that the existence of statutory protection renders a search per se unreasonable under the Fourth Amendment. And the precedents counsel otherwise."); *see also United States v. Williams*, 124 F.3d 411, 425-28 (3d Cir.1997) (disclosure of wiretapped calls to grand jury in violation of Pennsylvania statute did not warrant suppression in federal prosecution).

The Court agrees with the United States that an analysis of the procedures under the Pennsylvania Wiretapping Act is not determinative of its consideration under the Fourth Amendment. As such, it turns to question of whether the monitoring, recording, and use of the phone calls was reasonable. The government points out that the telephone system in both institutions provided multiple advance notice to users that phone calls by prisoners would be recorded: (1) in the inmate handbook; (2) by signs posted in the telephone area; and (3) a recorded message at the beginning and periodically throughout each call. Thus, the government argues that Defendant repeatedly consented to the telephone recordings and that she had no reasonable expectation of privacy when using the telephone.

The Court agrees with the position of the United States. As this Court has previously held, use of a prison telephone is a privilege, not a right, and a prisoner's choice-even a Hobson's choice-to use a monitored telephone implies his/her consent to be monitored. *United States v. Aley*, 2009 WL 3364873 *4 (W.D.Pa.2009). In fact, beyond the advance notice through which Defendant had to proceed before making a phone call, her own words, as evidenced by the transcript of the comments she made in the course of a phone call on November 23, 2008 (GE 11), manifest both an acknowledgment that her phone calls were subject to monitoring and

recording, and also her knowing desire to proceed in the fact of that monitoring. The transcript of that phone call further demonstrates Defendant's knowing desire to proceed in the face of that monitoring. Accordingly, it is abundantly clear that Defendant did not have a reasonable expectation of privacy as to the recording of her telephone calls while imprisoned, and therefore, such recordings will not be suppressed.

**C.      Defendant's rights under the Fifth Amendment have not been violated.**

1.      Defendant's right to be free from self-incrimination has not been violated

The Fifth Amendment to the U.S. Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const., amend V. Anyone "questioned by law enforcement officers after being 'taken into custody or otherwise deprived of his freedom of action in any significant way' must first 'be warned that he has a right to remain silent, that any statement he does make may be used against him, and that he has a right to the presence of an attorney, either retained or appointed.'" *Stansbury v. California*, 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) (*quoting Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)). This now familiar warning, and the rights expressed within the warning, has come to be commonly known as the *Miranda* warning, or *Miranda* rights, in reference to the seminal Supreme Court decision. It is well-established that law enforcement officers must administer *Miranda* warnings whenever a suspect is "taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning." *Miranda*, 384 U.S. at 478-479. *Miranda* prohibits statements derived from police coercion from being offered as evidence against an accused. *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

For *Miranda* rights to attach, the statements made by a defendant must be part of a custodial interrogation. *Illinois v. Perkins*, 496 U.S. 292, 297, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990). "Interrogation" in this context is not limited to police questioning, but also includes "words or actions on the part of police officers that they should have known were reasonably

likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 302, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). Said another way, *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. *Id.* at 300 - 301.

Defendant argues that her Fifth Amendment right to be free from self-incrimination was violated by the "inherently coercive" conditions of confinement "passively compelling confessions" through and from her use of the inmate phone system at both the ACJ and CCP. Doc. No. 90 at ¶¶ 20 - 24. The United States argues that Defendant's use of the inmate phone system did not run afoul of her rights under the Fifth Amendment because her use of the phones was not an interrogation within the meaning of *Miranda*. Doc. No. 158 at § III.E (referencing *Innis*, 446 U.S. at 299 - 301). The Court agrees.

For the purpose of the protection afforded under the Fifth Amendment, interrogation "as conceptualized in the *Miranda* opinion must reflect a measure of compulsion above and beyond that inherent in custody itself." *Innis*, 446 U.S. at 300. The Court finds that Defendant was not "interrogated" within the meaning of *Miranda*. It is undisputed that the first prong of the definition of "interrogation" was not satisfied, for there was no express questioning of the Defendant by any law enforcement or corrections officer during the course of the telephone conversations. As is obvious from the facts and circumstances, the conversations were nothing more than discussions over a telephone that Defendant initiated through collect calls with people of her choosing, knowing full well that the calls would be monitored, recorded, and divulged to law enforcement, including the FBI. Likewise, Defendant's act of making collect telephone calls was not the "functional equivalent" of questioning. This latter portion of the definition of "interrogation" is included in order to vest a suspect in custody with an added measure of protection against coercive police practices, and focuses primarily upon the perceptions of the suspect rather than the intent of the police. *Id.* at 301; *see also United States v. Brownlee*, 454 F.3d 131, 147 (3d Cir. 2006). The passive act of simply providing access to an inmate telephone

system, however, a system in which inmates are clearly aware that calls are subject to monitoring and recording and it is the inmate who chooses when to make calls and to whom calls should be made, cannot be characterized as a coercive police practice reasonably likely to evoke an incriminating response. The fact that incriminating statements are made by inmates when using an inmate telephone system does not make the statements the result of an interrogation. *Miranda* protects those accused of crimes from making incriminating statements in response to questioning or coercive acts on the part of the police while in custody; it is not designed to protect those same individuals from the potential consequences of their own freely made assertions in the absence of any such compulsion.

2.     <u>Defendant's right to testify on her own behalf has not been unconstitutionally impeded.</u>

As the Supreme Court has previously recognized, the right to testify on one's own behalf at a criminal trial derives from several provisions of the Constitution, namely the Fourteenth, Sixth, and Fifth Amendments. The guarantee of the Fourteenth Amendment that no one shall be deprived of liberty without due process of law includes a right to be heard and to offer testimony. *Rock v. Arkansas*, 483 U.S. 44, 51, 107 S.Ct. 2704, 2709 (1987)(citing *In re Oliver*, 333 U.S. 257, 273, 68 S.Ct. 499, 507, 92 L.Ed. 682 (1948). Similarly, the right to testify is also found in the Compulsory Process Clause of the Sixth Amendment which grants a defendant the right to call "witnesses in his favor", and which logically includes the defendant's own testimony, testimony that may be both material and favorable to the defense. *Id.* (citing *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867, 102 S.Ct. 3440, 3446, 73 L.Ed.2d 1193 (1982))[6]. As the Supreme Court further recognized, the opportunity to testify is a necessary corollary to the Fifth

---

[6]     *See also Faretta v. California*, 422 U.S., at 819, 95 S.Ct., at 2533, wherein the Supreme Court recognized that the Sixth Amendment:

"grants to the accused personally the right to make his defense. It is the accused, not counsel, who must be 'informed of the nature and cause of the accusation,' who must be 'confronted with the witnesses against him,' and who must be accorded 'compulsory process for obtaining witnesses in his favor.'"

Amendment's guarantee against compelled testimony. *Harris v. New York*, 401 U.S. 222, 230, 91 S.Ct. 643, 648, 28 L.Ed.2d 1 (1971)("Every criminal defendant is privileged to testify in his own defense, or to refuse to do so.")[7]

Framing her claim within the context of a Fifth Amendment violation pursuant to the *Harris* decision (citation *supra)*, Defendant argues that "the wholesale, unlimited, extra-judicial eavesdropping afforded the government by unfettered access to all of the tape recorded calls of the accused has a chilling effect" on her constitutionally protected ability to testify on her own behalf. *See* Doc. No. 90 at ¶¶ 20 - 23. In response, the government notes that with the *Harris* decision, the Supreme Court further held that if an accused chooses to testify at trial on her own behalf, the government may cross-examine her with her own statements, even with those statements obtained in violation of the Fifth Amendment *Miranda* rights of said accused (as was the circumstance in *Harris*). Doc. No. 158 at § III.E. The government also argues that while criminal defendants have the privilege to testify on their own behalf , "that privilege cannot be construed to include the right to commit perjury" by way of the advantageous avoidance of impeachment through cross-examination. *Id.* (citing *Harris*, 401 U.S. at 225, 91 S.Ct. At 645).

The Court agrees with the United States. At the outset, the Court notes that under the

---

[7]       While the decision in *Harris* identifies the ability to testify on one's own behalf in terms of a constitutional privilege, 401 U.S. at 230, 91 S.Ct., at 648 ("The choice of whether to testify in one's own defense ... is an exercise of the constitutional privilege."), the Court also notes that the Supreme Court has repeatedly proceeded on the premise that the right to testify on one's own behalf in defense to a criminal charge is a fundamental constitutional right. *See, e.g., Nix v. Whiteside*, 475 U.S. 157, 164, 106 S.Ct. 988, 993, 89 L.Ed.2d 123 (1986); *id.* at 186, n. 5, 106 S.Ct., at 1004, n. 5 (BLACKMUN, J., concurring in judgment); *Jones v. Barnes*, 463 U.S. 745, 751, 103 S.Ct. 3308, 3312, 77 L.Ed.2d 987 (1983) (defendant has the "ultimate authority to make certain fundamental decisions regarding the case, as to whether to ... testify in his or her own behalf"); *Brooks v. Tennessee*, 406 U.S. 605, 612, 92 S.Ct. 1891, 1895, 32 L.Ed.2d 358 (1972) ("Whether the defendant is to testify is an important tactical decision as well as a matter of constitutional right"). Any distinction between the use of the terms "constitutional privilege" as compared to "constitutional right", to the extent there are any, does not impact this ruling.

circumstances present here, no independent "chilling effect" analysis, for lack of a better way to describe it, is required. Defendant raises this issue under the same Fifth Amendment challenge as involved her right to be free from self-incrimination. The Supreme Court has spoken directly on this issue and specifically held that not only can defendants be impeached through cross-examination with their own statements, even unconstitutionally obtained statements, but to hold otherwise would render the shield provided by *Miranda* "perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances." *Harris*, 401 U.S. at 226. Once having voluntarily chosen to take the stand and testify, a criminal defendant is under the obligation to speak truthfully and accurately, and, concomitantly, a prosecutor is permitted to "utilize the traditional truth-testing devices of the adversary system" to test said truthfulness or accuracy. *See id.* at 225. To be clear, while the issue in *Harris* involved the use of statements previously held to have been collected in violation of that defendant's Fifth Amendment rights, for the reasons stated herein, there was no violation of Defendant's protection from self-incrimination, or in violation of *Miranda,* in the procurement of her statements as contained within the telephone call recordings. In any event, there was no government action which resulted in an unconstitutional chilling effect on Defendant's ability to testify truthfully on her own behalf. Accordingly, Defendant's motion to suppress the evidence based upon violations of her rights under the Fifth Amendment will be denied.

**D.      Defendant's rights under the Sixth Amendment have not been violated.**

An accused's Sixth Amendment rights are violated when her own incriminating words are used against her after being "deliberately elicited" from her following the initiation of adverse judicial proceedings. *See United States v. Henry*, 447 U.S. 264, 270-72 (1980); *Massiah v. United States*, 377 U.S. 201, 206, 84 S.Ct. 1199, 1203 (1964); *accord Fellers v. United States*, 540 U.S. 519, 524 (2004)(Sixth Amendment violation occurs when a state agent deliberately elicits incriminating statements outside the presence of defense counsel); *Maine v. Moulton*, 474 U.S. 159, 176 ((1985)("[T]he Sixth Amendment is violated when the State obtains incriminating

statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent."). There is no dispute that criminal charges had been initiated against Defendant, that she had been arraigned on a charge of criminal homicide for the death of Special Agent Hicks on November 19, 2008, and that she had met with her counsel shortly after being arrested and prior to being placed in the ACJ.

In her motion, Defendant argues that the monitoring of her phone calls violates her right to counsel under the Sixth Amendment because it is a method by which "law enforcement obtains statements from the accused without counsel present after the initiation of formal charges." Doc. No. 90 at ¶¶ 15 - 19. In her reply to the government's brief in opposition to her motion, Defendant further argues that "at times, [she] must speak to her family members in a private and confidential manner without government eavesdropping" in order to "effectuate her right to effective assistance of counsel and participate in her defense."

With respect to Defendant's first challenge, the question here is whether under these facts, a government agent deliberately elicited incriminating statements from Defendant in violation of the Sixth Amendment. The Court finds that there was no such elicitation. There is simply no factual basis upon which the Court can ascribe any conduct on the part of any government agent to deliberately draw information from Defendant. Defendant chose to place the collect telephone calls when she did. Defendant chose the person to whom the calls were placed. Defendant was not compelled to make any phone calls. Likewise, there is no suggestion that a state actor recruited, trained, instructed, or otherwise groomed any of persons with whom Defendant spoke during these phone calls to surreptitiously elicit information from Defendant. *Accord. U.S. v. Henry*, 3447 U.S. 264, 100 S.Ct. 2183 (1980). The extent of government action was no more than passively listening and collecting what was said by Defendant, which does not run afoul of the Sixth Amendment. "[T]he Sixth Amendment is not violated when a passive listening device collects but does not induce, incriminating comments." *Henry*, 447 U.S. at 276 (Powell, J., concurring).

19

Defendant's second Sixth Amendment challenge to render her phone conversations with family members confidential as an extension of the attorney-client privilege fails on both legal and factual grounds. As a general legal proposition, Defendant seeks an extension of the privilege to inmate phone calls with family members initiated and conducted by her, a proposition that would do violence to the history and purpose of the privilege itself. The rule is designed to enable a client to confide in her attorney, secure in an assurance that there will be no disclosure. The privilege does not encapsulate everything tangentially associated with the existence of the attorney-client relationship. As the Court of Appeals for the Sixth Circuit aptly noted:

> It is to be remembered that the attorney-client privilege is an exception carved from the rule requiring full disclosure, and as an exception should not be extended to accomplish more than its purpose. As Dean Wigmore said in his oft-quoted statement: 'It is worth preserving for the sake of a general policy, but it is nonetheless an obstacle to the investigation of the truth. It ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle.' 8 Wigmore, Evidence § 2291, at 554 (McNaughton rev. 1961).

*United States v. Goldfarb,* 328 F.2d 280, 282 (6th Cir.), *cert. denied,* 377 U.S. 976, 84 S.Ct. 1883 (1964). Defendant's position on this issue rests solely upon the general rhetoric of the constitutional importance of preparing for trial. On its face, that broad position appears to be in direct conflict with both the inherently limited purpose of the privilege rule itself, and the cautionary circumstances under which any extension of the rule should apply. Beyond that, there is simply no factual basis upon which the Court could rule otherwise.

The Court recognizes that while extensions of the attorney-client privilege are limited, they are not unheard of, and the existence of such turns upon the particular facts and details of the nature of the relationships between the persons involved. The burden of establishing the application of the attorney-client privilege rests with the claimant against disclosure, in this case Defendant. *See Goldfarb,* 328 F.2d at 282; *see also U.S. v. Naegele*, 468 F.Supp.2d 165, 169 (D.C.C. 2007); *U.S. v. Schmidt*, 360 F.Supp. 339, 346 (E.D. Pa 1973). No evidence is before the Court to provide any context for consideration of extending the privilege of confidentiality.

20

Instead, Defendant argues that she "must" communicate with her family in private in order to prepare for trial. *See* Doc. No. 184 at p. 6. However, there was no evidence to suggest the necessity for communicating with her family through the use of the inmate phone system in lieu of simply communicating with her attorney or meeting with family members personally. The inmate telephone systems at both ACJ and CCP provide inmates with the ability to place phone calls to their attorneys that are confidential, unmonitored, and unrecorded, and do not require the use of intermediaries.[8] Nor has Defendant provided any evidentiary basis to extend the privilege to someone other than her attorney. There is no indicia of what relationship, if any, the family members have with Defendant's counsel other than the vague suggestion that family members are necessary to convey information.

A corollary to the argument that the attorney-client privilege should be extended to communications made to family members is the additional consideration of whether the attorney-client privilege is waived when attorney-client communications are disclosed to others who do not share the privilege. This issue was not addressed by Defendant. To that end, the Court notes that uncontradicted testimony established that at both the ACJ and CCP, Defendant is able to converse with members of her family during regularly scheduled visitation hours to the respective jails without those conversations being monitored or recorded. This is not to suggest that the Court considers communication made during such personal visits in this case to be confidential pursuant to the attorney-client privilege (in view of the Court's specific holding that Defendant has failed to carry her burden to justify extending the privilege to family members).

---

[8] The Court notes the single occurrence referenced herein at footnote 5 in which the inmate phone system at CCP failed to recognize a phone call placed on June 18, 2009 to Defendant's counsel as confidential. All testimony regarding that call, namely the testimony of Captain Sobecky (who manages the CCP inmate phone system) and Special Agent Terrence Sweeney of the FBI (who listened to the recording of the phone call), establish that this was an entirely inadvertent and isolated incident. Further, the Court notes that Defendant has not suggested, much less produced any evidence to support the notion, that this inadvertent breach necessitates extending the attorney-client privilege to her family members.

However, it is referenced here simply for the purpose of noting the existence of a means available to Defendant in which she can communicate "in a private and confidential manner" with family members while incarcerated. (Quotation taken from Defendant's reply to the government response in opposition, filed at Doc. No. 184). Defendant's choice to communicate that which she considers to be privileged information to family members via the inmate telephone system, a medium she knows is monitored and recorded, as opposed to doing so in the more private setting of personal visits with family members, at a minimum, could very well suggest waiver of the privilege she seeks. Given the fact that the Court finds the privilege not to apply to her phone calls to family members, it does not hold at this juncture that Defendant did in fact waive her attorney-client privilege.

In sum, there is no factual basis upon which the Court can consider Defendant's request. Nonspecific and unattributed representations of phone calls made while incarcerated at unspecified times to unidentified persons with undefined familial relationships with Defendant fails to provide any basis for an extension of a privilege of attorney-client confidentiality.

E.     **Defendant's rights under the Due Process Clause have not been violated.**

Defendant argues that her right to due process of law and a fair trial is violated with the collection and use of the telephone recordings. More particularly, Defendant avers "The systematic recording of pretrial detainees' telephone calls and providing the recordings to the prosecution for use in the detainee's upcoming trial violates Due Process by creating an automatic mechanism whereby the government obtains extraordinary discovery that has been and will be used against the accused, without providing reciprocal discovery to the defendant." In support of this position, Defendant references the Supreme Court's decision *Wardius v. Oregon*, 412 U.S. 470, 93 S.Ct. 2208 (1973) for the proposition that "due process forbids enforcement of discovery rules for the prosecution unless defendants are also afforded the same reciprocal discovery rights." Doc. No. 90 at ¶¶ 10 - 15.

In response, the government contends that *Wardius* is inapposite to the circumstances

here presented.  The Court agrees.  In *Wardius*, Oregon state law barred the defendant from presenting an alibi defense because he had not complied with a notice-of-alibi statute.[9]  The Supreme Court reversed, holding that it violated due process to require a defendant to give pretrial notice of his alibi without affording him reciprocal discovery rights, namely the reciprocal requirement on the part of the state to reveal the names and addresses of witnesses it would use to refute an alibi defense.  In the Supreme Court's view, it was "fundamentally unfair" to require a defendant to reveal the details of his own case while remaining subject to surprise at trial regarding the state's case.  (*Wardius*, *supra*, 412 U.S. at p. 476, 93 S.Ct. at p. 2213.)  The due process concerns that underlie that decision are simply absent here.  At the time, Oregon granted "no discovery rights to criminal defendants," *Id.* at 475, a situation which the Supreme Court found "particularly suspicious."  In contrast, Defendant has been afforded an array of materials and government disclosures.  *See e.g.* Doc. No. 205, Memorandum Order of Court dated June 10, 2010, detailing, *inter alia*, the ten pre-trial discovery motions filed by Defendant, the government's responses thereto, and the government's pre-trial discovery obligations not already disclosed.  For this reason, in concert with the other reasons included herein, the Court finds nothing fundamentally unfair about the government's use of Defendant's own statements made during collect phone calls while incarcerated that requires any additional reciprocal discovery.

---

[9]     At the time, Ore.Rev.Stat. § 135.875 provided:

'(1) If the defendant in a criminal action proposes to rely in any way on alibi evidence, he shall, not less than five days before the trial of the cause, file and serve upon the district attorney a written notice of his purpose to offer such evidence, which notice shall state specifically the place or places where the defendant claims to have been at the time or times of the alleged offense together with the name and residence or business address of each witness upon whom the defendant intends to rely for alibi evidence. If the defendant fails to file and serve such notice, he shall not be permitted to introduce alibi evidence at the trial of the cause unless the court for good cause orders otherwise.'(2) As used in this section, 'alibi evidence' means evidence that the defendant in a criminal action was, at the time of commission of the alleged offense, at a place other than the place where such offense was committed.'

**F.      Defendant's motion for identification of jail calls**

In addition to her motion to suppress tape recorded telephone conversations from the ACJ and CCP, Defendant moves for identification of those calls the government intends to use at trial pursuant to Fed.R.Crim.P. 12(b)(4).  Doc. No. 104.  In response, the government notes that Fed.R.Crim.P. 12(b)(4) provides only that a defendant may request notice of the government's intention to use any evidence in the presentation of its evidence-in-chief at trial that is discoverable under Rule 16, in order to provide defendants with the opportunity to file a motion to suppress, which is a subtle but distinctively narrower obligation to notify compared to Defendant's somewhat broader demand for evidence "which may arguably be subject to challenge or suppression." *See* Doc. No. 163.  Furthermore, the government avers that it has already complied with the requirements of Rule 12(b)(4), specifically noting that it has provided Defendant with copies of all telephone calls that were recorded at the ACJ and CCP, a fact not challenged by Defendant.  *Id.*   The government correctly notes that the purpose of Rule 12(b)(4) is to afford a defendant with the opportunity to move to suppress evidence, which Defendant did prior to moving for the identification of the calls.  The Court acknowledges that the United States has nevertheless offered to, and assured the Court that it will, provide a list of the audio files that the government intends to use in its case-in-chief to counsel for the Defendant, as well as a transcript of the portion of the call that it intends to use, which will be provided at least one month prior to trial.  *Id.*  As such, Defendant's motion will be denied as moot.

## CONCLUSION

For the reasons hereinabove stated, the motion to suppress the tape recorded telephone conversations from the ACJ and the CCP, will be denied.  Furthermore, the motion to identify the jail calls will be denied as moot.  An appropriate Order follows.

McVerry, J.

24

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | **2:09-cr-05** |
| v. | ) | |
| | ) | |
| CHRISTINA MARIE KORBE, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER OF COURT

**AND NOW**, this 14th day of July, 2010, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED, ADJUDGED AND DECREED** that DEFENDANT'S MOTION TO SUPPRESS TAPE RECORDED TELEPHONE CONVERSATIONS FROM THE ALLEGHENY COUNTY JAIL AND THE CAMBRIA COUNTY PRISON (Doc. No. 90) is **DENIED**.

It is further **ORDERED**, that, DEFENDANT'S MOTION FOR IDENTIFICATION OF JAIL CALLS (Doc. No. 104) is **DENIED AS MOOT**.

BY THE COURT:

s/  Terrence F. McVerry
United States District Court Judge

cc:    Caroline M. Roberto, Esquire
         Email: croberto@choiceonemail.com

         Jay T. McCamic, Esquire
         Email: jtmccamic@mspmlaw.com

         Troy Rivetti, AUSA
         Email: Troy.Rivetti@usdoj.gov

         Bruce J. Teitelbaum, AUSA
         Email: Bruce.Teitelbaum@usdoj.gov

         Donovan Cocas, AUSA
         Email: Donovan.Cocas@usdoj.gov